1
2
3
4
5
6
7
8
9

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| MARIA TORRES and MELCHOR TORRES, individually and as Adminstrators of the Estate of EVERARDO TORRES, and as guardians ad litem for the brother of the Deceased,  RAMON TORRES (a minor through his guardians ad litem, MARIA and MELCHOR TORRES) and MELCHOR TORRES, JR.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>CITY OF MADERA, MARCY NORIEGA, individually and as a member of the Madera Police Department, and DOES 1 through 50, inclusive,<br><br>                    Defendants.<br>_____<br><br>AND RELATED CONSOLIDATED CASE<br>_____ | CIV F F 02-6385 AWI LJO<br><br>Consolidated with CV F 03-5999<br><br><br>ORDER ON DEFENDANT TASER INTERNATIONAL'S MOTION FOR SUMMARY JUDGMENT |

24
25
26
27
28

       This is basically an equitable indemnity suit based on products liability theories brought by the City of Madera and Officer Marcy Noriega ("Plaintiffs") against Taser International ("Defendant").  It stems from the shooting of Everardo Torres by Madera Police Department

1   ("Madera PD") Officer Noriega.  Torres's relatives filed suit earlier against Madera/Noriega (but

2   not Taser International) and the two suits have been combined.  Taser has moved for summary

3   judgment on all claims against it.  After hearing oral argument, the Court ordered Taser and

4   Madera/Noriega to submit additional briefing.  The parties have now submitted the requested

5   briefing.  After reviewing the evidence submitted and the moving papers, the Court will grant

6   Taser's motions.

7

8                                    **FACTUAL BACKGROUND**[1]

9          On October 27, 2002, Everardo Torres was fatally shot by Plaintiff Marcy Noriega, who

10  used her police service weapon instead of her Taser M26 ("M26"), which is manufactured and

11  distributed by Defendant.  See DUMF No. 1.  Plaintiffs obtained the M26 around October 2001.

12  See DUMF No. 2.  Plaintiffs claim that Defendant defectively designed the M26 "to so closely

13  resemble a police service weapon" that a "reasonable police officer" would mistakenly draw and

14  fire a hand gun instead of the M26.  See DUMF No. 3.  Plaintiffs also claim that Defendant

15  should have warned them that the Taser M26 should not be mounted "on the same side as a

16  police officer would wear a service handgun;" they specifically allege that Defendant should

17  have notified them and provided training to them about prior incidents in Rochester, Minnesota

18  and Sacramento, California in which police officers shot suspects because they mistakenly drew

19  service weapons instead of their tasers.  See DUMF No. 4.

20         Patrick Smith, an executive officer of Defendant, testified that in a registration packet

21  filed with the Securities Exchange Commission, the following representations were made: "the

22  Advanced Taser is shaped and designed to function like a standard handgun," and "[a]ccordingly,

23  it is easy for law enforcement officers to use during stressful situations since their firearms

24  training familiarizes them with the muscle movements required for its operation."  See

25

26         [1]The facts for this recitation are taken from either "undisputed" material facts to which the parties have
    agreed, or are taken from the record.  "DUMF" is Defendants' Undisputed Material Facts.  "DSUMF" refers to
27  Defendant's separate statement of facts in support of additional briefing filed on March 28, 2005.

28  daw                                            2

1  Deposition of Patrick Smith at 126:5-25.  Smith testified that law enforcement training officers

2  and experts approved of the design because the training officers believed that it was important

3  that the design conform to the training and muscle skills used with firearm training.  See id. at

4  127:21-129:2.  Prior to October 27, 2002, Defendant was aware of two other instances where

5  officers had mistakenly used their service weapons instead of their tasers – one occurred on

6  March 11, 2001, in Sacramento and the second incident occurred in Rochester on September 2,

7  2002.  See id. at 65:8-66:9; 91:13-93:5.

8       Steve Frazier was a Sergeant with the Madera PD until 2002 and thereafter became its

9  Operations Commander.  See DUMF No. 5.  Frazier is currently the Administrative Commander

10  for the Madera PD.  See id.  As a sergeant, however, Frazier was responsible for weapons

11  acquisition.  See id.  As part of his weapons acquisition responsibilities for the Department,

12  Frazier investigated the potential purchase of the M26 for the Madera PD.  See DUMF No. 6.[2]

13  Also, Officer Randy Williams, who budgeted finances and approved purchase orders for

14  weapons acquisition, spoke with Defendant sometime in the summer of 2001 and received an

15  M26 with approximately four test cartridges.  See Deposition of Randy Williams at 23:1-21;

16  Deposition of Steve Frazier at 178:14-25.  The City purchased a quantity of M26's and holsters in

17  September 2001 from ALD de Nio Enterprises ("ALD"), Defendant's distributor in California,

18  rather than from Defendant itself.  See DUMF No. 7.[3]  After purchasing the M26's and the

19

20       [2]Plaintiffs respond to DUMF No. 6 by stating that the fact is disputed in that Williams first looked into
tasers and that Williams was ultimately responsible for deciding whether to purchase them.  See Plaintiffs' Separate

21  Statement of Disputed Facts in Opposition to Taser's Motion for Summary Adjudication at ¶ 6.  Plaintiffs rely on
one page of deposition testimony by Williams as support for their dispute.  However, the one page simply says that

22  Williams spoke with someone at Defendant and then received an M26 with test cartridges.  The deposition excerpt
does not state or support a finding that Williams was the first to look into tasers or that he had ultimate responsibility

23  for deciding whether to purchase tasers.  Although the deposition testimony of Steve Frazier states that Williams had
the responsibility to budget finances and approve purchase orders, Frazier also testified that he was responsible for

24  the purchase or "sheperding" through the purchase of the tasers.  See Deposition of Steve Frazier at 175:22-24.
Accordingly, DUMF No. 6 is deemed undisputed.

25
       [3]Plaintiffs opposition to DUMF No. 7 reads, "This is disputed in that Comm. Williams received the first

26  demo M26 directly from Taser; MPD [Madera Police Department] was told by Taser that it must purchase all
products through Taser's exclusive distributor and ALD was not authorized to provide any training not developed

27  and approved by Taser."  Plaintiffs' Opposition to Defendant's Undisputed Material Facts at ¶ 7.  This opposition

28  daw                                3

holsters, high ranking officers from the Madera PD (Frazier, Williams, and Chief Jerry Noblett) held a meeting and decided that Madera PD officers would wear the M26 in the "strong side draw" fashion.[4]  See DSUMF No. 1.  Defendant itself did not provide direct training to the City of Madera other than transmitting periodic bulletins to Madera PD's representatives through facsimile or voice-mail.  See DUMF No. 8.  London Lewis, the Vice President of ALD, trained several Madera police officers in the use of the M26 in October 2001, so as to familiarize them with that weapon and to ensure that they had the necessary skills to become instructors and train their own students/officers.  See DUMF No. 9.  Lewis was a "Master Instructor" with respect to the M26.  See Declaration of Jami Hill at ¶ 7.  "Master Instructors" receive their certification/approval from Defendant's Master Instructor Training Board.  See Deposition of Stephen Tuttle at 36:4-10.  Furthermore, master instructors teach from materials provided by Defendant in order to ensure consistency and are restricted to using only the lesson plan provided by Defendant.  See id. at 36:11-37:16.  Officer Frazier understood that Lewis was an employee of ALD and that ALD and Defendant are separate entities.  See DUMF No. 10.[5]  In December 2001,

_____

does not refute DUMF No. 7.  Furthermore, the evidence relied on for the opposition does not support the assertion that MPD was told by Defendant that it must purchase all products through Defendant's exclusive distributor. Despite Plaintiffs' opposition, DUMF No. 7 is deemed undisputed.

[4]A "strong side draw" means that the weapon is worn on the same side as the officer's dominant hand (weapon worn on the right side of a right handed individual).  See DSUMF No. 1; Deposition of Randy Williams at p.48-49.  A "weak side draw" means that the weapon is worn on the non-dominant side of the officer and drawn by the non-dominant hand (weapon warn on the left side of a right handed individual).  See Deposition of London Lewis at 131:13-20.  A "cross draw" means that the weapon is worn on the non-dominant side, but the officer reaches across his body and draws with the dominant hand.  See Plaintiffs' Opposition to Summary Judgment Re: Holster Claims at 2 n.1; March 28, 2005, Declaration of Stephen Tuttle at ¶¶ 5-6.

[5]In the initial submissions, Plaintiffs did not dispute DUMF No. 10.  In supplemental briefing, however, Plaintiffs say that Frazier never testified that he had any knowledge regarding the relationship between ALD and Defendant.  First, Plaintiffs should have complied with Local Rule 56-260(b) by reprinting the disputed fact, explaining the basis for the dispute, and providing evidentiary support for their dispute.  Plaintiffs did not do this. Second, Frazier testified as follows:

    Q:    **What is your understanding of the  - - is it your understanding that ALD de Nio Enterprises is a separate entity from Taser?**

    A:    Yes.

    Q:    **Was that your understanding at the time that you purhcased the Tasers from ALD De Nio Enterprises?**

    A:    Yes.

Marcy Noriega, along with other City of Madera police officers, received training in the use of the M26 by fellow City of Madera police officers Dilbeck, Ballard, and Autry. See DSUMF No. 2. The training materials used were originally prepared by Defendant, but included blank portions for police departments, such as Madera PD, to fill in and individualize with their own policies and procedures. See DSUMF No. 3.

Prior to the incident with Everardo Torres, Officer Noriega was involved in another incident in which she had confused her M26 and her Glock service weapon; that incident occurred in the field, when she pulled her gun instead of her taser. See DUMF No. 11. The prior incident in which Noriega confused her taser and her Glock happened in a cold month near the time Plaintiffs first got the M26's. See DUMF No. 12. After Noriega had mistakenly drawn her gun instead of her M26, she told her sergeant (Sergeant Lawson) as well as the officer who was on call with her, that she had done so. See DUMF No. 13. After Noriega told Sergeant Lawson about the prior incident in which she had confused her gun for her taser, she never received any additional training in the use of her M26. See DUMF No. 14. Sergeant Lawson, however, did instruct Noriega that she needed to practice more. See Deposition of Charles Dino Lawson at 62:22-23.[6] Lawson testified that he told Noriega to practice drawing her Glock and M26 "so that she could become comfortable with them and wouldn't have any confusion." Id. at 125:22-24; DSUMF No. 4. When asked what the responsibility of Sergeant Lawson would have been if Officer Noriega had informed him that she had mistakenly pulled her service weapon when in fact she intended to draw her M26, Officer Frazier responded that Noriega should have been referred for further training to identify what the problem was. See Deposition of Steve Frazier at 141:13-21. Frazier also opined that if Lawson knew that Noriega was having weapon confusion

Deposition of Steve Frazier at 175:25-176:5. Lewis also testified that he understood that London Lewis was an employee of ALD de Nio and not Defendant. See id. at 176:9-24. Because Plaintiffs did not timely or correctly dispute DUMF No. 10 under Local Rule 56-260(b), and because Frazier's deposition supports DUMF No. 10, DUMF No. 10 is undisputed.

[6]The parties have not submitted the entire deposition of Officer Lawson; any references to the deposition of Lawson are excerpts provided by the parties in the moving papers.

problems but did not send Noriega for further training, then Lawson would not have been doing his job as a supervisor. See id. at 141:22-142:6.

In April 2001, Defendant transmitted a "Taser International News & Bulletin" to its contacts within the law enforcement community that were in its database. See Deposition of Steve Tuttle at 63:23-64:10; Exhibit 1 to Deposition of Stephen Tuttle. The April 2001 training bulletin stated in pertinent part:

> TRAINING ISSUE: HOLSTER THE ADVANCED TASER IN A CROSS-DRAW: To eliminate any risk of confusion between lethal and less-lethal force, we strongly advocate carrying lethal force on your strong-hand side and all less-lethals on your weak hand side in cross-draw to prevent any muscle memory confusion from a firearm to a less-lethal. Chief Instructor Hans Marrero requests keeping less-lethals on one side (the left for a right-hander) but still using the strong-arm with gross motor skill indifference for shooting. If agencies are using right-handed holsters they can be easily moved to the cross-draw without the need for a new holster. More on this topic on our website.

Exhibit 1 to Deposition of Steve Tuttle at ¶ 6. Officer Frazier testified that he had received training bulletins that looked like the April 2001 bulletin, but could not recall receiving any specific bulletins. See DUMF No. 18. Frazier testified that he believed that he was receiving training bulletins from Defendant in January 2001. See Deposition of Steve Frazier at 161:21-162:2. When Frazier received training bulletins from Defendant that looked like the April 2001 bulletin, he would throw the bulletin out without reading it. See DUMF No. 19.[7]

On the date of the shooting, October 27, 2002, Noriega testified that she reached for her M26, but unsnapped the Glock holster and pulled out her Glock instead, aimed the laser site at the center mass of Torres, pulled the trigger, and killed Torres. See Noriega Deposition, Vol. I,

---

[7]Plaintiffs argue that the fact is disputed and misleading in that it erroneously presumes that Frazier ever received any bulletin. Plaintiffs further argue that Frazier threw away any spam e-mail from Defendant since the City was not a client. See Plaintiff's Opposition to Defendant's Undisputed Material Fact No. 19. Despite Plaintiffs' arguments, DUMF No. 19 remains undisputed. DUMF No. 19 does not erroneously presume that Frazier received any bulletin as Frazier's own deposition testimony makes clear that he did receive bulletins that looked like the April 2001 bulletin, otherwise he would have had nothing to throw away. Furthermore, Plaintiffs present no evidence that explains why Frazier threw away the bulletins.

However, Defendant has not presented evidence that specifically shows that the City actually received the April 2001 bulletin. The only evidence referenced by Defendant is two excerpts from Steve Tuttle. These excerpts state that the April 2001 bulletin was sent to anyone in their database (pages 63-64) and the second excerpt deals mainly with a discussion between counsel about unidentified "copies" (pages 84-85).

at 129:24-132:18.  Noriega testified that she could feel neither the molded handle of the Glock nor the trigger of the Glock.  See id. at 132:19-24.  Noriega never looked at her gun when she reached for a weapon, pulled out the Glock, and killed Mr. Torres with it.  See DUMF No. 21.[8] Noriega was wearing her M26 in a thigh holster strapped below her Glock.  See Noriega Deposition, Vol. I, p. 167:11-168:22; Plaintiffs' Opposition to Summary Judgment at 1:23-25.

In 2002, Torres' parents brought suit in federal court under 42 U.S.C. § 1983 against Officer Noriega and the City of Madera for the death of Torres.  Later, the City and Noriega brought suit, essentially for indemnification, against Defendant in a separate state court proceeding.  Defendant removed to this Court.  In their suit against Defendant, Plaintiffs allege strict products liability for defective design and failure to warn, negligent design of the M26 and accessories, negligent warning/training, breach of implied and express warranties, equitable indemnification, and contribution.  Plaintiffs pray for damages and costs, a declaration of the proportionate negligence/fault of Defendant which proximately caused or contributed to Plaintiffs' loss, damage or injury and a corresponding order that Defendant be required to reimburse Plaintiffs in that proportionate amount for any judgment for which Plaintiffs are found liable to Torres in the underlying lawsuit, and, if Plaintiffs are held liable to Torres in the underlying action, judgment in the same amount together with attorney's fees, investigative expenses and courts costs according to proof, be rendered against Defendant.[9]  Defendant now moves for summary judgment on all claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine

---

[8]Plaintiffs respond to DUMF No. 21 by stating that the fact is true, but it is misleading in that it omits the undisputed fact that Noriega relied on the same muscle memory, instinct, and training that Defendant used in design rather than sight.  Plaintiffs cite to no evidence to support their claim that the fact is misleading.  DUMF No. 21 remains undisputed.

[9]At oral argument, Plaintiffs clarified that they do not seek monetary damages under strict products liability, negligence, and breach of warranty.  Rather, Plaintiffs seek indemnification based on these causes of action.

1    issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

2    Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970); <u>Fortyune v.</u>

3    <u>American Multi-Cinema, Inc.</u>, 364 F.3d 1075, 1080 (9th Cir. 2004); <u>Jung v. FMC Corp.</u>, 755

4    F.2d 708, 710 (9th Cir. 1985).  Where summary judgment requires the court to apply law to

5    undisputed facts, it is a mixed question of law and fact.  <u>See</u> <u>Sousa v.Unilab Corp. Class II (Non-</u>

6    <u>Exempt) Members Group Benefit Plan</u>, 252 F. Supp.2d 1046, 1049 (E.D. Cal. 2002).  Where the

7    case turns on a mixed question of law and fact and the only dispute relates to the legal

8    significance of the undisputed facts, the controversy for trial collapses into a question of law that

9    is appropriate for disposition on summary judgment.  <u>See</u> <u>Union Sch. Dist. v. Smith</u>, 15 F.3d

10   1519, 1523 (9th Cir. 1994); <u>Sousa,</u> 252 F.Supp.2d at 1049.

11
12
13

> Under summary judgment practice, the moving party always bears the initial
> responsibility of informing the district court of the basis for its motion, and
> identifying those portions of "the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any," which
> it believes demonstrate the absence of a genuine issue of material fact.

14   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

15   burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

16   in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on

17   file.'"  <u>Id.</u>  Indeed, summary judgment should be entered, after adequate time for discovery and

18   upon motion, against a party who fails to make a showing sufficient to establish the existence of

19   an element essential to that party's case, and on which that party will bear the burden of proof at

20   trial.  <u>Id.</u> at 322.  "[A] complete failure of proof concerning an essential element of the

21   nonmoving party's case necessarily renders all other facts immaterial."  <u>Id.</u>  In such a

22   circumstance, summary judgment should be granted, "so long as whatever is before the district

23   court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is

24   satisfied."  <u>Id.</u> at 323.

25       If a moving party fails to carry its burden of production, then "the non-moving party has

26   no obligation to produce anything, even if the non-moving party would have the ultimate burden

27

28   daw             8

of persuasion." <u>Nissan Fire & Marine Ins. Co. v. Fritz Companies</u>, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  If the moving party meets it initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  <u>See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>Nissan Fire & Marine Ins.</u>, 210 F.3d at 1103; <u>Nolan v. Cleland</u>, 686 F.2d 806, 812 (9th Cir. 1982); <u>Ruffin v. County of Los Angeles</u>, 607 F.2d 1276, 1280 (9th Cir. 1979).  A fact is "material" if it might affect the outcome of the suit under the governing law.  <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986); <u>Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn</u>, 322 F.3d 1039, 1046 (9th Cir. 2002).  A "genuine issue of material fact" arises when the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>See Anderson</u>, 477 U.S. at 248-49; <u>Thrifty Oil</u>, 322 F.3d at 1046.

In attempting to establish the existence of a factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11; <u>First Nat'l Bank</u>, 391 U.S. at 289; <u>Willis v. Pacific Maritime Ass'n</u>, 244 F.3d 675, 682 (9th Cir. 2001).  However, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  <u>First Nat'l Bank</u>, 391 U.S. at 290; <u>Hopper v. City of Pasco</u>, 248 F.3d 1067, 1087 (9th Cir. 2001).  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  <u>Matsushita</u>, 475 U.S. at 587; <u>Mende v. Dun & Bradstreet, Inc.</u>, 650 F.2d 129, 132 (9th Cir. 1982).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  <u>See</u> Rule 56(c); <u>Fortyune</u>, 364 F.3d at 1079-80.  The court has the discretion in appropriate circumstances

1 to consider materials that are not properly brought to its attention, but the court is not required to

2 examine the entire file for evidence establishing a genuine issue of material fact where the

3 evidence is not set forth in the opposing papers with adequate references.  See Southern Cal. Gas

4 Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified

5 Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  The evidence of the opposing party is to be

6 believed, and all reasonable inferences that may be drawn from the facts placed before the court

7 must be drawn in favor of the opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475

8 U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless,

9 inferences are not drawn out of the air, and it is the opposing party's obligation to produce a

10 factual predicate from which the inference may be drawn.  See Sousa, 252 F. Supp.2d at 1049.

11      Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

12 show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken

13 as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

14 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  If the nonmoving party

15 fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is

16 entitled to summary judgment.  See Nissan Fire & Marine, 210 F.3d at 1103.

17     ‾‾‾‾‾‾

18 **A.      STRICT LIABILITY – DESIGN DEFECT**

19      California recognizes strict liability for three types of product defects – manufacturing

20 defects, design defects, and warning defects (inadequate warnings or failure to warn).  See

21 Anderson v. Owens-Corning Fiberglass Co., 53 Cal.3d 987, 995 (1991).  "A manufacturer,

22 distributor, or retailer is liable in tort if a defect in the . . . design of its product causes injury

23 while the product is being used in a reasonably foreseeable way."  Soule v. General Motors

24 Corp., 8 Cal.4th 548, 560 (1994).  A design is defective in one of two ways.  First, a product's

25 design is defective if it has failed to perform as safely as its ordinary consumers would expect

26 when used in an intended or reasonably foreseeable manner.  See id. at 567; Barker v. Lull

27

28   daw                                            10

1   Engineering Co., 20 Cal.3d 413, 454 (1978).  Second, a product's design is defective if the

2   design embodies "excessive preventable danger," that is, the risk of danger inherent in the design

3   outweighs the benefits of such design.  Barker, 20 Cal.3d at 430.  Under the second method, the

4   finder of fact may consider "among other relevant factors, the gravity of the danger posed by the

5   challenged design, the likelihood that such danger would occur, the mechanical feasibility of a

6   safer alternative design, and the adverse consequences to the product and to the consumer that

7   would result from the alternative design."  Id.

8       A manufacturer is liable only when a defect in its product was a legal cause of injury.  See

9   Soule, 8 Cal.4th at 572.  A defect is a legal cause of an injury when it is a substantial factor in

10  producing the injury.  See id.  A substantial factor is a factor that "a reasonable person would

11  have considered to have contributed to the harm."  See California Jury Instructions – Civil

12  (CACI) (July 2004 ed.) at § 430.  The substantial factor standard subsumes the "but for" rule of

13  causation.  See Rutherford v. Owens-Illinois, 16 Cal.4th 953, 968-69 (1997).  Thus, where an

14  injury would have occurred even in the absence of a defect, the defect cannot be a substantial

15  factor in bringing about harm.  See Viner v. Sweet, 30 Cal.4th 1232, 1240 (2003); Soule, 8

16  Cal.4th at 572.  Although undue emphasis should not be placed on the word "substantial,"

17  something which plays only a "negligible," "infinitesimal" or "theoretical" part in bringing

18  about an injury, damage or loss is not a substantial factor.  See Kennedy v. Southern Cal. Edison

19  Co., 268 F.3d 763, 770-71 (9th Cir. 2001); Bockrath v. Aldrich Chemical Co., 21 Cal.4th 71, 79

20  (1999); Rutherford, 16 Cal.4th at 969 (discussing People v. Caldwell, 36 Cal.3d 210, 220

21  (1984)); see also CACI § 430.  Although strict liability is intended in part to relieve a plaintiff of

22  "many of the onerous burdens inherent in a negligence cause of action," strict liability "was never

23  intended to make the manufacturer or distributor of a product its insurer."  Carlin v. Superior

24  Court, 13 Cal.4th 1104, 1110 (1996); Anderson, 53 Cal.3d at 994.

25      ***1.      The Taser M26***

26      Defendant argues that whether Plaintiffs rely on the "consumer expectations" or "risk

27

28  daw                                                        11

benefit" test for establishing a design defect, the existence of a causal connection must be established.  Any similarity in appearance between the Taser M26 and Noriega's Glock did not contribute to the shooting of Torres because Noriega admitted in her deposition that "she never looked at the gun after drawing it and before shooting Mr. Torres and never even used, touched, or looked at her Taser M26 during that incident."  Defendant also points out through additional briefing that it has been unable to locate any cases where a defendant has been held strictly liable when the product in question was not "used."

### Plaintiffs' Opposition

Plaintiffs respond that they only need to create an inference that the design of the M26 was a substantial factor in the death of Torres.  Essentially, the testimony of Patrick Smith shows that Defendant designed the M26 to be shaped and to function like a gun and the risk of confusion clearly outweighs the benefits.  Because the M26 was shaped and designed to function like a gun, Officer Noriega thought that she was utilizing her M26 when in fact she had her Glock.  But for the similarity in shape and function of the M26 with a gun, Torres would not have been shot.  The design of the M26 was intended to be similarly shaped and function as a handgun and was a substantial factor in the death of Torres.  Furthermore, Plaintiffs argue that for a design defect, "use" of the product is only required under the "consumer expectations" test; use is not required for the "risk/benefit" test, rather all that is necessary is that the risk inherent in the design outweighs its benefits.  Finally, Plaintiffs argue that Noriega was "using" her Taser M26 in a reasonably foreseeable and intended way – she wore it as part of her police equipment.

### Discussion

The Court ordered additional briefing on whether any cases have imposed strict products liability on a defendant when the defendant's product was not "used," with reference to the facts of this case.  Defendant states that it has found no such cases.  Plaintiffs argue that "use" is not a required element of the "risk/benefit" test for design defect and, regardless, Noriega was "using" the M26 because she was wearing it.

daw                                        12

In *Soule*, the California Supreme Court discussed strict products liability, and more particularly, imposing such liability under a design defect theory.  Before discussing in detail the two methods of proving a design defect, either "consumer expectation" or "risk/benefit," the court explained design defect in general.  See Soule, 8 Cal.4th at 560-67.  The *Soule* court stated:  "A manufacturer, distributor, or retailer is liable in tort if a defect in the manufacture or *design* of its product causes injury while the product is being *used* in a reasonably foreseeable way."  Soule, 8 Cal.4th at 560 (emphasis added).  The *Soule* court also noted that in *Barker v. Lull Engineering*, the case relied upon by Plaintiffs, that there are situations where the consumer expectation test will be improper and the risk/benefit test must be utilized because the consumer will have no idea how a product should reasonably perform.  See id. at 567.  Citing to *Barker*, the *Soule* Court gave as an example an automobile because the ordinary consumer "simply has 'no idea' how [the automobile] should perform in all foreseeable situations, or how safe it should be made against all foreseeable hazards."  See id. (citing Barker, 20 Cal.3d at 430).  Implicit in that discussion is the premise that a person was injured while using the automobile.  Although the injured person may not know how a complex product should reasonably function when used in a given situation, recovery is still possible under the risk/benefit test despite the consumer's lack of knowledge and the inapplicability of the consumer expectations test.  See id.

Moreover, the California Jury Instructions confirm that "use" of the product is a required element under the risk/benefit theory.  See CACI § 1204.  Under CACI § 1204, the following instruction is given for "Strict Liability – Design Defect – Risk-Benefit Test – Essential Factual Elements":

> [Plaintiff] claims that the [product's] design caused harm to [Plaintiff].  To establish this claim, [Plaintiff] must prove all of the following:
> 1.  That [Defendant] [manufactured/distributed/sold] the [product];
> 2.  [That, at the time of the *use*, the [product] was substantially the same as when it left [defendant's] possession];[10]
> 3.  That the [product] was *used* [or misused] in a way that was

---

[10]There is an alternative to this paragraph regarding reasonably foreseeable changes to a product; however, this is omitted because there is no contention that changes to the M26 were made.

reasonably foreseeable to [defendant]; and

4.    That the product's design was a substantial factor in causing harm
to [Plaintiff].

CACI § 1204 (emphasis added).[11]  The language of CACI § 1204 and *Soule* and the absence of any case authority imposing liability on a defendant when the defendant's product was not used leads to the conclusion that, under the risk/benefit design defect theory, a plaintiff must show that the product was actually "used."

Plaintiffs argue that the M26 was "used" at the time of the shooting because Noriega was wearing the taser as part of her police equipment.  Plaintiffs are stretching the term "use" too far.  No products liability case has been cited or found where the term "use" has been defined.  Merriam-Webster has several definitions of "use," the pertinent definitions being:  to put into action or service:  avail onself of:  employ . . . to carry out a purpose or action by means of:  utilize."  Merriam-Webster On-Line Dictionary at http://www.m-w.com.

Here, the evidence indicates that Noriega was wearing the M26, but the weapon that she grabbed and used to shoot Torres was the Glock.  The M26 was never even touched.  When something is used, there is the sense that one is utilizing, employing or manipulating the object for the purpose for which the object is designed (absent misuse) and not simply passively carrying the object.  A taser is likely "used," as that term is commonly understood, when an officer aims the taser, fires the taser, the taser probes or nodes attach/insert, and/or the officer sends electric pulses through the wire.  Other than passively wearing or carrying the M26, there is no indication that the taser was "used" at the time of this shooting.  There is insufficient evidence

---

[11]CACI § 1204 goes on to state:

If [Plaintiff] has proved these four facts, then your decision on this claim must be for [Plaintiff] unless [Defendant] proves that the benefits of the design outweigh the risks of the design.  In deciding whether the benefits outweigh the risks, you consider the following:

(a)    the gravity of the potential harm resulting from the use of the product;
(b)    the likelihood that such harm would occur;
(c)    the feasibility of an alternative design;
(d)     the cost of an alternative design;
(e)    the disadvantages of an alternative design;
(f)    [other relevant factors].

that the M26 was "used" during the shooting of Torres.  Accordingly, summary judgment is

appropriate for Defendant on this claim.

### 2.    The Thigh Holster for the Taser M26

Plaintiffs argue that the holster that Defendant "manufactured, recommended, and sold

was defective in that it gave the officer only two options – (1) wear it on the dominant side

(without disclosing two weapon confusion incidents) or, (2) wear it on the undesirable non-

dominant side in cross-draw configuration with a high risk [to] officer safety."  Plaintiffs'

Opposition to Summary Judgment Re: Holster Claims at 7.  Plaintiffs argue that although the

holster may not have been the sole cause of the shooting, it played a role and was thus a

"substantial factor."

However, the Declaration of Stephen Tuttle indicates that he is the person most familiar

with the holsters sold to Madera PD through ALD.  See March 28, 2005, Declaration of Stephen

Tuttle at ¶ 4.  During October 2001, he was director of government and law enforcement affairs

and responsible for providing specifications for taser holsters to manufacturers.  See id. at ¶ 3.

During 2001, Tuttle declares that he was involved in the procurement and manufacture of the

holsters.  See id. at ¶ 4.  Tuttle declares that the right handed holster was designed to be worn on

either the right or left side of the body – when mounted on the right side the grip faces to the

back of the officer's body and when mounted on the left side, in a "cross-draw" configuration,

the grip faces towards the body.  See id. at ¶ 5.  Tuttle then declares that the left handed holster

was also designed to be mounted on either the left or right side of the body – when mounted on

the left side the grip faces to the back of the officer's body and when mounted on the right side,

in a "cross-draw" configuration, the grip faces towards the body.  See id. at ¶ 6. From Tuttles's

declaration, there were more than two options available.

This is further confirmed in the testimony of London Lewis, the vice-president of ALD.

In his deposition, the following exchange occurred between Plaintiffs' counsel and Lewis:

**Q:    It[, the AT Pack Holster, is] designed specifically for a right-hand side or left-
hand side unless you cross-draw?**

A:    It's intended for the department to specify right- or left-handed.

**Q:**    **Okay.  And as of September 28, you knew or at least your company knew that Madera P.D. was going 90 percent with right-hand holster?**

A:    Okay.

**Q:**    **Correct?  According to the invoice.**

A:    According to the invoice, that's what I see.

Deposition of London Lewis at 171:3-12.  Moreover, in the e-mail from Lewis to the Madera PD, the price for the thigh holster was listed with a request that either a left-sided or right-sided holster be specified.  <u>See</u> Exhibit 4 to the Declaration of Bruce Praet.  In contrast, the price of the M26 was listed and there was no request to specify "right side" or "left-side."[12]  <u>See</u> <u>id.</u>

Since there was a left handed holster and a right handed holster available, there were strong, weak, and cross draw options all available to Plaintiffs.  <u>See also</u> Deposition of London Lewis at 131.  Furthermore, in his deposition, Officer Williams testified:

> We wanted to maintain the motion of the muscle memory in the shooting hand, dominant hand, and ability to get the weapon fairly easily and the ability to keep the weapon under our control in the case where we were contacting people that may be suspects.  Because of those issues, we chose to keep it on the dominant side.

Deposition of Randy Williams at 48:22-49:2.

The basis for Plaintiffs' claim is that the holster design allowed only for a dominant draw, which increases the risk of weapons confusion, or a cross draw, which exposes the officers to unnecessary dangers from suspects.  <u>See</u> Plaintiffs' Opposition to Summary Judgment Re: Holster Claim at 7:24-8:24.  However, the evidence as outlined above shows that a weak side holster was available.  <u>See also</u> Deposition of London Lewis at 131.  Moreover, the Madera PD chose a dominant side holster because they wanted to maintain the muscle memory in the shooting hand and the ability to get the weapon "fairly easily."  <u>See</u> <u>id.</u> at 48:22-24.  The decision

---

[12]Although the parties do not cite to this portion of the London Lewis's deposition, Lewis confirmed that the taser is ambidextrous.  <u>See</u> Deposition of London Lewis at 131:17.

1   was made by Williams, Frazier, Chief Noblett, and possibly Officer Mike Jeffries.  See id. at

2   48:1-9.  The premise behind Plaintiffs's holster design defect claim is faulty because there was in

3   fact a holster available that allowed for a weak side draw.  Also, it seems that any holster that can

4   be worn on the dominant side would have the same defects identified by Plaintiffs.  In other

5   words, there is no identifiable design defect.

6       Furthermore, Noriega's holster was "used" in the sense that at the time of the shooting, it

7   held the M26 in place.  Nevertheless, the holster actually involved in the shooting of Torres was

8   the holster containing the Glock.  See Noriega Deposition at 130:17-131:10.  When Noriega

9   manipulated the holster to remove a weapon, it was the holster of the Glock.  See id.  As it

10  appears that Noriega never touched her M26, it also appears that she never touched her M26's

11  holster.  Noriega's taser holster was not "used" in relation to the shooting.  See Soule, 8 Cal.4th

12  at 560; CACI § 1204.

13      Finally, there is a problem with causation.  For a risk/benefit design defect claim, the

14  product's design must be a substantial factor in causing the harm.  See Barker, 20 Cal.3d at 431;

15  CACI § 1204.  The design of the holster was to either be worn on the right or left side,[13]

16  depending on whether the individual wished a strong, weak, or cross draw.  There is no evidence

17  that the holster itself was the efficient cause of the shooting.  Cf. Powell v.Standard Brands Paint

18  Co., 166 Cal.App.3d 357, 364 (1985).  The indication is that the holster carried the M26 as it was

19  intended on the side of the body it was made for.  Furthermore, the holster was strapped below

20  the Glock on Noriega's thigh at the time of the shooting.  There is no testimony or evidence from

21  Noriega that the holster actually played any role in causing her to confuse her M26 and her Glock

22  during the Torres shooting.  The holster was and is a passive product and Plaintiffs do not

23  explain or argue how the holster played any appreciable role in the shooting of Torres.

24  Something that plays only a negligible or theoretical part in bringing about a result is not a

25

26  _____

27      [13]From the declaration of Stephen Tuttle, there appears to have been one "design" that had two "variations":
    a right-sided and a left-sided.  See March 28, 2005, Declaration of Stephen Tuttle at ¶¶ 5-6.

28  daw                                    17

substantial factor.  See Kennedy, 268 F.3d at 770-71; Bockrath, 21 Cal.4th at 79; Rutherford, 16 Cal.4th at 969.  Given the above considerations, Defendant's holster played too remote a part in the shooting – Plaintiffs have not shown that the holster played anything other than a negligible, insubstantial or theoretical part in the shooting.  See Kennedy, 268 F.3d at 770-71; Bockrath, 21 Cal.4th at 79; Rutherford, 16 Cal.4th at 969; Even F., 8 Cal.App.4th at 835-38.

For the reasons discussed above, summary judgment is appropriate on this claim.

**B.     STRICT LIABILITY – FAILURE TO WARN**

*Legal Standard*

A manufacturer may be held strictly liable where its product has a "warning defect," that is, an inadequate warning or a failure to warn.  See Anderson, 53 Cal.3d at 995.  "A manufacturer owes a foreseeable user of its product a duty to warn of risks of using the product."  See Huynh v. Ingersoll-Rand, 16 Cal.App.4th 825, 833 (1993); Powell, 166 Cal.App.3d at 362.  The manufacturer's duty is "restricted to warning based on the characteristics of the manufacturer's own products."  Powell, 166 Cal.App.3d at 364.  Manufacturers are strictly liable for injuries caused by their failure to give a warning of dangers or risks that were known or reasonably knowable at the time they manufactured and distributed the product.  See Carlin, 13 Cal.4th at 1109-10; Anderson, 53 Cal.3d at 1000.  However, a manufacturer is not required to warn "against every conceivable" risk associated with the use of the product.  See Schwoerer v. Union Oil Co., 14 Cal.App.4th 103, 112 (1993).  "Liability [for a warning defect] does not attach if the dangerous propensity is either obvious or known to the injured person at the time he uses the product."  Burke v. Almaden Vineyards, Inc., 86 Cal.App.3d 768, 772 (1978); see also Plenger v. Alza Corp., 11 Cal.App.4th 349, 362 (1992); Krawitz v. Rusch, 209 Cal.App.3d 957, 966 (1989); Gonzales v. Carmenita Food Truck Sales, Inc., 192 Cal.App.3d 1143, 1151-52 (1987); Aguayo v. Crompton & Knowles Corp., 183 Cal.App.3d 1032, 1042 (1986); Lee v. Electric Motor Division, 169 Cal.App.3d 375, 387 (1985); Holmes v. J.C. Penney Co., 133 Cal.App.3d 216, 220 (1982);

daw                                                          18

1  Bojorquez v. House of Toys, Inc., 62 Cal.App.3d 930, 933-34 (1976); 6 Witkin: Torts (9th Ed.

2  1988) § 1265.  In other words, the manufacturer must warn when the danger or risk would not

3  have been recognized by ordinary users of the product.  See Aguayo, 183 Cal.App.3d at 1042;

4  CACI § 1205 at ¶ 4 (stating that a strict liability failure to warn plaintiff must establish, *inter*

5  *alia*, "That ordinary consumers would not have recognized the potential [risks/side

6  effects/allergic reactions]").

7  **_1.     The Taser M26_**

8         Defendant argues that it is entitled to summary judgment on Plaintiffs' failure to warn

9  theory on three grounds: (1) there is no duty to warn of a risk that is obvious or already known to

10 the plaintiff; (2) the product was not actually used as in *Powell v. Standard Brands Paint Co.*;

11 and (3) Defendant provided an express warning through the April 2001 training bulletin of the

12 risk of weapons confusion.

13       *Plaintiffs' Opposition*

14       Plaintiffs argue that, under *Anderson*, a manufacturer has a duty to warn the end user of

15 the risks or dangers of its product that the manufacturer knew or should have known about.

16 Taser knew about the danger of weapons confusion in March 2001 and September 2002 because

17 its was aware of the Sacramento and Rochester incidents.  They were thus required to give a

18 warning that was both adequately delivered and clear, understandable and completely

19 unambiguous.  See Temple v. Velcro, 148 Cal.App.3d 1090, 1095 (1983).   The warning given in

20 the April 2001 training bulletin was buried as the sixth item in the bulletin, did not identify itself

21 as a warning and made no references to the Sacramento incident.  Further, there is no evidence

22 that the City ever actually received the bulletin; moreover, the City was not a client of Defendant

23 in April 2001.

24       With respect to the prior weapons confusion by Noriega, Plaintiffs argue that the incident

25 was a one time, non-eventful confusion that happened shortly after the City received the M26.  It

26 was not enough to put Noriega or the City on notice of the problem. Furthermore, both Sgt.

27

28  daw                                              19

1  Lawson and Chief Kime testified that if they had been aware of the Sacramento incident, then

2  they would have required their officer to carry the M26 on their non-dominant side.

3      *Discussion*

4      Irrespective of whether a danger of "weapons confusion" between an M26 and a Glock is

5  a "danger" or "risk," Noriega and the Madera PD knew about the potential for "weapons

6  confusion."  The submitted evidence shows that, approximately one year earlier while she was in

7  the field, Noriega admitted that she drew her Glock when she intended to draw her M26.  She

8  told her supervising sergeant, Lawson, that she "pulled [her] gun instead of [her] taser wanting to

9  use [her] taser."  Noriega Deposition, Vol I, at 173:9-10; Deposition of Charles Dino Lawson at

10 62:13-15 (testifying that Noriega said that "she had an incident where she wanted to utilize her

11 Taser but she drew her firearm instead").  Plaintiffs characterize this as a single incident that was

12 a "non-event."  However, it is exactly the type of event, absent an actual shooting, that Plaintiffs

13 argue that they should have been warned about by Defendant, i.e. an alleged danger or risk of

14 weapons confusion between the M26 and a firearm.  Noriega knew that she had a problem with

15 drawing the correct weapon and she clearly thought it serious enough that she informed her

16 supervisor of her problem.  One year later, she apparently still had the same problem after

17 additional "practice."  In fact, Noriega testified that she was still practicing drawing her Glock

18 and her M26 in October 2002.  See id. at 175:1-15.  Additionally, the testimony of Officer

19 Williams indicates that there was probably discussion within the Madera PD regarding weapons

20 confusion before the holsters and tasers were purchased.   Williams testified:

21      Q:   During the discussion about where to wear the holster, was there any discussion
            about the fact that because the Taser would be worn on the dominant side that it
22          might create an issue of confusion of weapons for your officers?

23      **A:   I don't recall one way or the other how much discussion we had about that.
            I'm sure that there might have been discussion about that but I don't recall**
24      **specifically.**

25 Deposition of Randy Williams at 49:19-25.  Further, Sergeant Lawson testified that he instructed

26 Noriega to practice drawing her Glock and the M26 "so that [Noriega] could become comfortable

27

28

with them and wouldn't have any *confusion*."  Deposition of Charles Dino Lawson at 125:22-24 (emphasis added).  There is no liability for defective warning when the plaintiff knows about the danger at the time of use.  See Gonzales, 192 Cal.App.3d at 1151-52; Burke, 86 Cal.App.3d at 772.

Moreover, assuming that Plaintiffs are correct in their allegation that the M26 is defectively dangerous because it is too similarly designed in shape and functionality as a handgun that there is a risk of weapons confusion, then that defect hardly seems like the kind of defect or danger a police officer would fail to recognize.  The possibility of confusing two weapons, i.e. drawing one when actually intending to draw the other, that are allegedly defectively similar in shape and functionality and that are worn close together, is both readily recognizable and patently obvious to a layman, let alone a reasonable police officer.  There is no duty warn of such a danger.  See Plenger, 11 Cal.App.4th at 362; Krawitz, 209 Cal.App.3d at 966; Gonzales, 192 Cal.App.3d at 1151-52; Aguayo, 183 Cal.App.3d at 1042; Lee, 169 Cal.App.3d at 387; Holmes, 133 Cal.App.3d at 220; Burke, 86 Cal.App.3d at 772; Bojorquez, 62 Cal.App.3d at 933-34; 6 Witkin: Torts (9th Ed. 1988 and Supp.) § 1295; CACI § 1205 at ¶ 4.  Because Noriega and her supervisors were already aware of the possibility of weapons confusion and because the danger/risk of "weapons confusion" between the Glock and the M26 when worn close together (assuming Plaintiffs' allegations of defective and dangerous similarity is correct) is obvious and readily recognizable, summary judgment on this claim is appropriate.

### 2.    *The Holster for the Taser M26*

The above rationale applies equally to Plaintiffs' failure to warn theory with respect to the holster for the M26.  Essentially, Plaintiffs claim that the holster created a risk or danger of weapons confusion because the dominant side holster allowed only for a cross draw or a dominant draw on the same side as the firearm.  However, once Plaintiffs chose the dominant side thigh holster, the two options for wearing the holster (either strong draw or cross draw) were apparent.  Plaintiffs chose the dominant side holster, chose where to wear the holster, and thus

1   chose that the taser would be worn on the dominant side near the Glock.  See Deposition of

2   Randy Williams at 46:19-47:3; 48:20-49:8.  Furthermore, there is an indication from Officer

3   Williams that there was likely some recognition about possible weapons confusion by the

4   Madera PD if a dominant side holster was worn on the dominant side.  See id. at 49:19-25.

5   Choosing a holster and a "wearing position" that places the taser in close proximity to the firearm

6   creates an obvious risk of weapons confusion (assuming *arguendo* that Plaintiffs' allegations of

7   the defective and dangerous similarity between a Glock and the M26 are true).  Moreover,

8   Plaintiffs were aware that Noriega had previously drawn her Glock when intending to draw her

9   M26 months before Torres was shot.[14]  Because the risk is obvious, and likely was known by

10  Plaintiffs prior to purchase, Defendant was under no duty to warn about the possibility of

11  weapons confusion with respect to the holster.[15]  See Plenger, 11 Cal.App.4th at 362; Krawitz,

12  209 Cal.App.3d at 966; Gonzales, 192 Cal.App.3d at 1151-52; Aguayo, 183 Cal.App.3d at 1042;

13  Lee, 169 Cal.App.3d at 387; Holmes, 133 Cal.App.3d at 220; Burke, 86 Cal.App.3d at 772;

14  Bojorquez, 62 Cal.App.3d at 933-34; 6 Witkin: Torts (9th Ed. 1988 and Supp.) § 1295; CACI §

15  1205 at ¶ 4.  Summary judgment in favor of Defendant on this claim is appropriate.

16      ***3.      Training in the use of the Taser M26***

17      Strict products liability applies to products only and not to the performance of services.

---

19  [14]Although not specifically cited by the parties, Noriega also testified that the thigh holster had a tendency to ride up and become uncomfortable.  As part of that testimony, Noriega stated:

20  Q:    Did you think it was a problem insofar as you confusing your Glock and your taser?
      **A:    We all talked about it, but not specifics.**

21  Q:    Who is "we all" talked about it?
      **A:    The people on our shift or when we were getting trained.**

22  Q:    Who is "we all"?
      **A:    All of the officers.**

23  Deposition of Marcy Noriega, Vol. I, at 134:20-135:2.

24  [15]Further, this does not seems like a danger associated with the holster.  Presumably Plaintiffs expected a warning that use of the holster may put a second product, the M26, within close proximity of a third product, a

25  Glock, and thus increase the risk of an officer confusing the second product (the M26) with the third product (the Glock).  The alleged danger to be warned against is the danger of weapons confusion.  The danger would be

26  associated with the weapons, not the holster.  Since there is no duty to warn of weapons confusion with respect to the M26, I fail to see a duty to warn with respect to the holster since the "danger" does not arise from the holster.  Cf.

27  Powell, 166 Cal.App.3d at 364 (noting there is no duty to warn of the dangerous characteristics of other products).

28  daw                                          22

See Jimenez v. Superior Court, 29 Cal.4th 473, 479 (Cal. 2002); Ferrari v. Grand Canyon Dories, 32 Cal.App.4th 248, 259 (1995); Pierson v. Sharp Memorial Hospital, Inc., 216 Cal. App. 3d 340, 344-45 (1989).  "A product is a physical article which results from a manufacturing process and is ultimately delivered to a consumer."  Pierson, 216 Cal.App.3d at 345.

Here, irrespective of who actually trained either Noriega or the other Madera officers, "training" is not a physical article which results from a manufacturing process and that is ultimately delivered to a consumer.  "Training" is a service and is not subject to strict products liability theories.  See Jimenez, 29 Cal.App.4th at 479; Ferrari, 32 Cal.App.4th at 259; Pierson, 216 Cal.App.3d at 344-45.  Summary judgment is appropriate for Defendant on all strict products liability claims based on "training."

### 4.     Training Materials

Ideas and expressions in books are generally not considered products for purposes of strict products liability.  See Winter v. G.P. Putnam's Sons, 938 F.2d 1033, 1035-36 (9th Cir. 1991).  However, strict liability has been imposed with respect to the publication of aeronautical charts.  See id.; see also Fluor Corp. v. Jeppesen & Co., 170 Cal.App.3d 468, 474-76 (1985).  Additionally, the doctrine of strict liability has not been extended to transactions whose primary objective is obtaining services or where the transaction's service aspect predominates and any product sale is merely incidental to the provision of the service.  See Pierson, 216 Cal.App.3d at 344; see also Ferrari, 32 Cal.App.4th at 259 (holding that incidental use of a "product" in the rendition of a service insufficient for strict products liability); Silverhart v. Mount Zion Hosp., 20 Cal.App.3d 1022, 1027-28 (1971).

Here, the only training materials appear to involve a powerpoint, CD/ROM or slide presentation, a test, and paper handouts.  See Exhibit C to Declaration of Daniel Wu.  The training materials are used to train others in the use of the taser.  Training is a service and not subject to strict products liability.  The training materials are simply aides to the training and are thus analogous to products that are used incidently to the provision of a service.  See Ferrari, 32

Cal.App.4th at 259.  In *Ferrari*, the court of appeals refused to hold liable defendants who provided rafting services for a plaintiff who was injured on/by the raft.  See Ferrari, 32 Cal.App.4th at 251-52.  In affirming summary judgment on the plaintiff's products liability claim, the court explained:

> Defendants did not provide plaintiff with a raft for her to use. They provided a service, i.e., recreational raft transportation on the Colorado River. Defendants provided all the materials for the trip, *instructions on rafting safety*, and guides to perform the labor and conduct the activities. Use of the raft, like the carpet in Pierson v. Sharp Memorial Hospital, Inc., supra, was merely an incident to this service. The law of strict product liability does not apply to defendants on these facts.

Id. at 259 (emphasis added).  Here, the object of the transaction was the purchase of tasers from ALD.  As part of the purchase of tasers, training was offered.  However, in furtherance of the training, training materials were used.  The training materials are incidental to training, a service, and thus, are not subject strict products liability.  See Jimenez, 29 Cal.4th at 479; Ferrari, 32 Cal.App.4th at 259; Pierson, 216 Cal.App.3d at 344-45.

Moreover, it is unclear how the training materials provided by Defendant are similar to the aeronautical charts in *Fluor*.  Aeronautical charts are qualitatively different from other printed materials.  In *Winter*, the Ninth Circuit addressed *Fluor* (and a similar Ninth Circuit case *Brocklesby*) in deciding whether strict liability could be applied to a publication, *The Encyclopedia of Mushrooms*, where users of the publication ate poisonous mushrooms and became critically ill.  See Winter, 938 F.2d at 1034-36.  The court held that the aeronautical charts were fundamentally different from *The Encyclopedia of Mushrooms* because of the charts' technical and "tool-like" nature.  See id.  The court explained:

> Aeronautical charts are highly technical tools. They are graphic depictions of technical, mechanical data. The best analogy to an aeronautical chart is a compass. Both may be used to guide an individual who is engaged in an activity requiring certain knowledge of natural features. Computer software that fails to yield the result for which it was designed may be another. In contrast, The Encyclopedia of Mushrooms is like a book on how to use a compass or an aeronautical chart. The chart itself is like a physical "product" while the "How to Use" book is pure thought and expression.

Id.

Although training materials or instructions are not quite the same as a book about mushrooms, they are closer to the *Encyclopedia of Mushrooms* than aeronautical charts. As the *Winter* court explained, aeronautical charts "are highly technical tools" that are analogous in use to a compass. See id. Training materials are closer to "how to" materials that explain how to do something; they are not contemporaneously used as a tool, for example, by pilots while approaching an airport. Similarly, although the training instruction was not the focus of the product liability suit, the *Ferrari* court held strict products liability theories to be inapplicable and noted that the rafting guides gave instructions regarding rafting safety, i.e. how to safely raft. See Ferrari, 32 Cal.App.4th at 259. The training materials are closer to thoughts and expression on how to use a taser as opposed to a tool in and of itself, like aeronautical charts. Neither party has submitted training materials that are sufficiently comparable, or explained why they are comparable, to the aeronautical charts of *Fluor* or cited to cases involving materials other than aeronautical navigation charts. The training materials are not "products" and thus, strict products liability theory is not appropriate. See Winter, 938 F.2d at 1036.

Additionally, Plaintiffs' training materials claim appears to be that the materials are defective because they do not describe or warn against the possibility of weapons confusion. As described above, the "risk or danger" of weapons confusion when wearing the taser near the Glock was obvious and/or already known by Plaintiffs before the Torres shooting. In such circumstances, there is no duty to warn about weapons confusion and the training materials, even if considered to be products for the sake of argument, could not be considered defective for their failure to discuss or warn of weapons confusion. See Plenger, 11 Cal.App.4th at 362; Krawitz, 209 Cal.App.3d at 966; Gonzales, 192 Cal.App.3d at 1151-52; Aguayo, 183 Cal.App.3d at 1042; Lee, 169 Cal.App.3d at 387; Holmes, 133 Cal.App.3d at 220; Burke, 86 Cal.App.3d at 772; Bojorquez, 62 Cal.App.3d at 933-34; 6 Witkin: Torts (9th Ed. 1988 and Supp.) § 1295; CACI § 1205 at ¶ 4.

For the above reasons, summary judgment for Defendant on this claim is appropriate.

1   **C.      BREACH OF EXPRESS & IMPLIED WARRANTIES**

2       *1.      Taser M26*

3       *Defendant's Argument*

4       Defendant argues that only sellers give warranties under the Uniform Commercial Code,

5   which has been adopted in California.  The undisputed evidence shows that Defendant did not

6   directly sell the M26 to the City, rather, the M26 and accessories were sold by ALD.  In other

7   words, there is no privity between Plaintiffs and Defendant.  Further, Plaintiffs have failed to

8   plead any specific express warranties that were made by any party.

9       *Plaintiffs' Opposition*

10      Plaintiffs argue that Defendant is trying to escape liability simply because it required the

11  City to purchase M26's and holsters from its exclusive California distributor.  That is absurd and

12  is akin to Ford attempting to avoid liability because a Ford Explorer was purchased through an

13  independent, but exclusive Ford Dealership.  Furthermore, the law makes clear that one who

14  supplies a product directly or through a third person for another to use is subject to liability to

15  anyone the supplier should expect to use the product.  See Stevens v. Parke, Davis & Co., 9

16  Cal.3d 51, 64 (1973).[16]  Here, Defendant was well aware that the City was expected to use the

17  product after Defendant provided the City with a demonstration unit and then directed Madera to

18  the exclusive distributor, ALD.

19      Additionally, in supplemental briefing, Plaintiffs acknowledge that vertical privity is

20  required for implied warranties, but argue that there is sufficient evidence to support a finding of

21  vertical privity.  Plaintiffs argue that under *U.S. Roofing v. Credit Alliance Corp.*, 228

22  Cal.App.3d 1431 (1991), a written contract is not necessary to find vertical privity, rather the

23  degree of interaction and the nature of the relationship of the parties can create the requisite

24

25

26      [16]*Stevens*, however, is a negligence case and not a warranties case; it is inapposite to this issue.  See

27  Stevens, 9 Cal.3d at 58-59, 64.

28  daw                                      26

1   vertical privity.[17]  Here, there was significant interaction between Plaintiffs and Defendant:

2   Plaintiffs contacted Defendant and Defendant sent a demonstration M26 to Plaintiffs, Defendant

3   sent marketing materials (a training voucher and estimated monetary savings brochure) to the

4   Madera PD, Defendant continued to send FAX's, e-mails and training bulletins to Madera PD,

5   there was communication between Defendant and Plaintiffs after the shooting of Torres, and

6   Defendant offered to replace Plaintiffs's M26's with a model that had yellow markings.

7   Additionally, there is evidence that ALD was the agent of Defendant because ALD sent an e-mail

8   to Plaintiffs indicating that it had "sole-source documentation" from Defendant, Master Taser

9   Instructors (like London Lewis) are strictly controlled by Defendant, and the Distributor

10   Agreement between ALD and Defendant show that Defendant maintains strict control over ALD

11   and the power to control the manner and means of performance is the hallmark of an agency.

12   Thus, Plaintiffs argue that there is sufficient evidence for vertical privity.

13       *Legal Standard*

14       Section 2313(2) of Uniform Commercial Code reads, "Any . . . promise made by the

15   seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates

16   an express warranty that the goods shall conform to the promise."  Similarly, as noted in 3

17   Witkin: Sales, § 72, an implied warranty may be imposed "on any seller possessing sufficient

18   skill and judgment to justify the buyer's reliance."  California recognizes both the implied

19   warranty of fitness and the implied warranty of merchantability.  However, the "general rule is

20   that privity of contract is required in an action for breach of either express or implied warranty."

21   See All West Electronics v. M-B-W, 64 Cal.App.4th 717, 724 (1998); see Margarita Cellars v.

22   Pacific Coast Packaging, Inc., 189 F.R.D. 575, 579-80 (N.D. Cal. 1999); Burr v. Sherwin

23   Williams Co., 42 Cal.2d 682, 695 (1954); Fieldstone Co. v. Briggs Plumbing Products, Inc., 54

24

25       [17]Plaintiffs also rely on *Bay Summit Comm. Assoc. v. Shell Oil*, 51 Cal.App.4th 762, 776 (1996) as

26   providing factors to consider in determining whether or not any defendant in the marketing/distribution chain could
     be held strictly liable.  However, *Bay Summit*'s language is in the context of strict liability where privity is not a

27   requirement.  As the discussion in *Bay Summit* does not involve warranties, it is inapposite.

28   daw                                            27

1  Cal.App.4th 357, 369 n.10, 371 (1997).  Specifically, a plaintiff alleging breach of warranty

2  claims must stand in "vertical privity" with the defendant.  See Kennedy v. Baxter Healthcare

3  Corp., 43 Cal.App.4th 799, 810-11 (1996); Osborne v. Subaru of America, Inc., 198 Cal.App.3d

4  646, 656 (1988).  Vertical privity means that the plaintiff and the defendant must "occupy

5  adjoining links in the distribution chain."  Kennedy, 43 Cal.App.4th at 810-11; Osborne, 198

6  Cal.App.3d at 656 n.6.  "For example, the distributor is normally in vertical privity with the

7  manufacturer, and the ultimate retail buyer is normally in vertical privity with the dealer.  But if

8  the retail buyer seeks warranty recovery against a manufacturer with whom he has no direct

9  contractual nexus, the manufacturer would seek insulation via the vertical privity defense."

10  Osborne, 198 Cal.App.3d at 656 n.6.  Nevertheless, there are exceptions to the privity

11  requirement such as reliance on the manufacturer's written representations in labels or

12  advertising materials.  See Fieldstone, 54 Cal.App.4th at 369 n.10.

13      **a.      Privity Through Course of Dealings**

14          Plaintiffs acknowledge the requirement of privity for implied warranties and their

15  additional argument focuses on meeting that requirement.[18]  As an initial matter, the chain of

16  distribution was Defendant to ALD to Plaintiffs.  Defendant and Plaintiffs do not occupy

17  adjoining links in this chain as they are separated by ALD.  See Kennedy, 43 Cal.App.4th at 810-

18  11; Osborne, 198 Cal.App.3d at 656 n.6.  Accordingly, there appears to be insufficient privity for

19  Plaintiffs's warranty claims.

20          Plaintiffs, however, rely heavily on *U.S. Roofing* as an example of conduct that creates

21  privity despite the absence of a written contract between the parties.  In *U.S. Roofing*, U.S.

22  Roofing contacted LAS to purchase a crane.  LAS sold the crane to LSC.  LSC then leased the

23  crane to U.S. Roofing.  U.S. Roofing later experienced problems with the crane and brought suit

24

25          [18]The parties were ordered to provide additional briefing on the effect of an exclusive distributor in the
26  chain of distribution for purposes of Plaintiffs's warranty claims.  There has been no further briefing on this issue,
   with the possible exception of an agency argument by Plaintiffs.  The Court will not consider the exclusive
27  distributor argument as the issue has been inadequately briefed.

28  daw                                                28

against both LAS and LSC for breach of warranty.  A jury returned a verdict against LAS and LSC and, on appeal, LAS argued that reversal was necessary because there was no privity between them and U.S. Roofing.  The Court of Appeals disagreed and explained:

> LAS asserts that since the evidence showed LAS sold the crane to LSC, not to U.S. Roofing, as a matter of law there was no privity between LAS and U.S. Roofing. Accordingly, LAS cannot be liable for breach of an implied warranty. This argument focuses solely on the paper contract; it ignores the considerable testimony regarding the direct dealings between LAS and U.S. Roofing for the sale and purchase of the crane. These parties had an oral agreement for the sale of the crane, supported by a deposit of $1,000, followed by a second deposit. LAS admits it made at least one express warranty as to the crane. When U.S. Roofing experienced problems with the crane, it contacted LAS for relief. Repairs on the crane were arranged and paid for by LAS. From this evidence the jury could find the necessary privity to support liability for breach of an implied warranty.

U.S. Roofing, 228 Cal. App. 3d at 1441-42.

California courts reviewing *U.S. Roofing* have concluded that the key to finding privity between LAS and U.S. Roofing was that LAS actually negotiated for the purchase of the crane, that is, there was an agreement for the sale of the crane between LAS and U.S. Roofing.  See All West Electronics, 64 Cal.App.4th at 724; Fieldstone Co., 54 Cal.App.4th at 371 n.12.

Here, Plaintiffs argue that this case is precisely in line with *U.S. Roofing* because Officer Williams first contacted Defendant directly and requested a demonstration taser and Defendant sent a promotional M26 with test cartridges.  Additionally, Plaintiffs point to a promotional flyer sent by Defendant to the Madera Police Chief that explained how employment of taser could save over $250,000, and also provided the Chief with a voucher for a free instructor course. Despite Plaintiffs's argument, these actions by Defendant are not the same as those between U.S. Roofing and LAS.  Plaintiffs have not presented evidence of negotiations for the sale of tasers, have not presented evidence that they gave Defendant earnest money or a down payment, and, most importantly, have not presented evidence that Plaintiffs and Defendant actually had an agreement for the purchase of the tasers.  See All West Electronics, 64 Cal.App.4th at 724; Fieldstone, Inc., 54 Cal.App.4th at 371 n.2; U.S. Roofing, 228 Cal.App.3d at 1441-42.  The

daw                                    29

1   Court cannot say that merely providing an advertisement that touts the possible financial benefits

2   of employing tasers is sufficient to create privity.  Moreover, offering to replace the tasers with a

3   different color scheme or providing a demonstration is insufficient to create privity.  See All

4   West Electronics, 64 Cal.App.4th at 722-24 (finding no privity despite repairs made by defendant

5   and demonstrations and operation of paver by defendant).  The activity relied on by Plaintiffs to

6   show privity between themselves and Defendant does not rise to the level of *U.S. Roofing*.  See

7   All West Electronics, 64 Cal.App.4th at 724; Fieldstone, Inc., 54 Cal.App.4th at 371 n.2; U.S.

8   Roofing, 228 Cal.App.3d at 1441-42.

9                          **b.      Privity Through Agency**

10           "Agency is the relationship which results from the manifestation of consent by one person

11   to another that the other shall act on his behalf and subject to his control, and consent by the

12   other so to act.  The principal must in some manner indicate that the agent is to act for him, and

13   the agent must act or agree to act on his behalf and subject to his control." Edwards v. Freeman,

14   34 Cal.2d 589, 592 (1949).  "Formation of an agency relationship is a bilateral matter.  Words or

15   conduct by both principal and agent are necessary to create the relationship . . ." van't Rood v.

16   County of Santa Clara, 113 Cal. App.4th 549, 570 (2003).  The essential characteristics or

17   essential indicia of an agency relationship are: "(1) the agent's power to alter legal relations

18   between the principal and others, (2) a fiduciary relationship, and (3) the principal's right to

19   control the agent's conduct." Vallely Invs. v. Bancamerica Commercial Corp., 88 Cal. App.4th

20   816, 826-27 (2001); Lewis v. Superior Court, 30 Cal. App.4th 1850, 1868-69 (1994); Alvarez v.

21   Felker Manufacturing Co., 230 Cal.App.2d 987, 999 (1964).  "An agency is either actual or

22   ostensible." Cal. Civ. Code § 2298; van't Rood, 113 Cal. App.4th at 570.  "An agency is

23   ostensible when the principal intentionally, or by want of ordinary care, causes a third person to

24   believe another to be his agent who is not really employed by him." Cal. Civ. Code § 2300; van't

25   Rood, 113 Cal. App.4th at 570.  To show an ostensible agency, a Plaintiff must essentially show

26   "(1) conduct by the [principal] that would cause a reasonable person to believe there was an

27

28   daw                                              30

agency relationship and (2) reliance on that apparent agency relationship by the plaintiff." <u>Mejia v. Community Hospital of San Bernardino</u>, 99 Cal. App.4th 1448, 1456-57 (2002).  "An agency is actual when the agent is really employed by the principal."  Cal. Civ. Code § 2299; <u>Associated Creditors' Agency v. Davis</u>, 13 Cal.3d 374, 383-84 (1975); <u>van't Rood</u>, 113 Cal. App.4th at 570. "It is elementary that actual agency must rest on agreement or consent."  <u>Naify v. Pacific Indem. Co.</u>, 11 Cal.2d 5, 12 (1938).  The existence of an agency is generally a question of fact unless the evidence is susceptible to a single conclusion or can be viewed in only one way.  <u>See Metropolitan Life Ins. Co. v. State Bd. of Equalization</u>, 32 Cal.3d 649, 658 (1982).

Here, Plaintiffs have pointed the Court to three pieces of evidence in support of their claim that ALD was the agent of Defendant: an e-mail from London Lewis that indicates ALD is a "sole source," deposition testimony from Stephen Tuttle regarding training materials utilized by Taser Master Instructors, and the Distributorship Agreement between ALD and Defendant. Tuttle's deposition deals with Taser Master Instructors and whether Master Instructors may utilize training materials other than those authorized by Defendant, it does not deal with the relationship between ALD and Defendant.  Additionally, the significance of the "sole source" e-mail from London Lewis to the Madera PD is unclear.  The e-mail states that "sole-source" documentation from Defendant is included and then proceeds to list the price of M26's and accessories and mentions that instruction is available.  Presumably this e-mail indicates that ALD is the only source available to Madera for tasers.  However, Plaintiffs do not explain the e-mail or the significance of the "sole source" language.  What Plaintiffs seem to rely on the most is the Distributorship Agreement between ALD and Defendant.

The Distributorship Agreement is seven pages and is between ALD and Defendant. Plaintiffs do not point to any particular language in the agreement to support their assertion of agency.  A review of the Agreement reveals some limitations by Defendant on ALD.  For example, the Agreement requires ALD to:  present Defendant's product in a reasonable and professional manner; adhere to all weapons safety and instructional regulations as instructed

during training; participate in governmental bids in accordance with Defendant's pricing and distribution program; refrain from exporting Defendant's products; attend and pass Defendant's training courses; refrain from selling competing products; sell products designated "law enforcement" to only law enforcement agencies (exceptions only with the approval of Defendant); use of Defendant's copyrighted and trademark material with advanced approval from Defendant; comply with Defendant's anti-felon identification program by registering the serial number of cartridges sold to individuals; and provide an audit balance sheet upon request.  See Exhibit 5 to the Declaration of Bruce Praet.  Significantly, the Distributorship Agreement states expressly that no agency is created.  In pertinent part, Paragraph 21 of the Distributorship Agreement reads:  "NO AGENCY:  LE [Law Enforcement] Distributor[s] are independent contractors, and under no circumstances will any LE Distributor commit the Company to the delivery of LE products, legally bind the company in any manner or hold him/her or itself out as an employee or agent with legal authority to bind the Company."  Id. (emphasis in original).

It is true that the Agreement does place limits on ALD and there is some control over ALD by Defendant.  However, the distributorship agreement does not specifically control how Defendant's products are actually sold or marketed, other than uses of Defendant's copyrights and trademarks.  More importantly, the Distributorship Agreement itself makes clear that no agency relationship is to be created.[19]  Control is a critical characteristic of an agency relationship, but there is no indication of a manifestation by Defendant that ALD is to act on Defendant's behalf or that ALD is a fiduciary.  See Edwards, 34 Cal.2d at 592; Vallely Invs., 88 Cal. App.4th at 826-27; Lewis, 30 Cal. App.4th at 1868-69; Alvarez, 230 Cal.App.2d at 999.  In other words, there is no basis for concluding that ALD has authority to alter the legal relationship between Defendant and others.  The creation of an agency relationship is bilateral and requires words or conduct from both the agent and the principal.  See Edwards, 34 Cal.2d at 592; van't

---

[19]Interestingly, the Distributorship Agreement also states that all distributor appointments are made on a non-exclusive basis.  See Exhibit 5 to Declaration of Bruce Praet at ¶ 5.

1  Rood, 113 Cal. App.4th at 570.  The Distributorship Agreement does not reflect bilateral,

2  agency-forming conduct or sufficient control.  The evidence produced by Plaintiffs does not

3  support the conclusion that ALD was the agent of Defendant.[20]

4      Because Plaintiffs have failed to show sufficient conduct between themselves and

5  Defendant, and because Plaintiffs have failed to produce sufficient evidence that supports an

6  agency relationship between ALD and Defendant, Plaintiffs cannot show privity between

7  themselves and Defendant.  Since privity is a requirement for both express and implied

8  warranties, summary judgment in favor of Defendant on these claims is appropriate.[21]  See

9  Maragarita Cellars, 189 F.R.D. at 579-80; Burr, 42 Cal.2d at 695; All West Electronics, 64

10  Cal.App.4th at 724; Fieldstone Co., 54 Cal.App.4th at 369 n.10; Kennedy, 43 Cal.App.4th at

11  810-11; Osborne, 198 Cal.App.3d at 656 & n.6.

12      ***2.      Holster of the Taser M26***

13      Plaintiffs cite to the deposition of Officer Williams and argue that the Defendant

14  recommended the holster.  Williams testified in deposition that he learned from Officer Frazier

15  that Defendant had recommended the holster.  See Deposition of Randy Williams at 47:13-15.

16      However, it is unclear what exactly was said to Frazier or how the recommendation was

17  made or what Frazier in turn told the other decision makers – Williams, Chief Noblett and

18  possibly Officer Jeffries.  Evidence in opposition to summary judgment should be specific and

19  not vague or ambiguous.  See Willis, 244 F.3d at 682.

20      Furthermore, it remains clear that ALD and not Defendant sold the holsters to Plaintiffs.

21  Thus, the problem of privity remains.   Relatedly, for the implied warranty of fitness, the "seller"

22  must know of the particular purpose, the buyer relies on the "seller's" skill or judgment, and the

23  ─────────────────

24      [20]To the extent Plaintiffs may be alleging an ostensible agency, Plaintiffs have failed to provide evidence of conduct by Defendant that would reasonably cause Plaintiffs to believe that ALD was the agent of Defendant.  See

25  Mejia, 99 Cal. App.4th at 1456-57.  Officer Frazier testified that he was aware that ALD and Defendant were separate.  See DUMF No. 10.  Additionally, Plaintiffs have failed to produce any evidence of detrimental reliance.

26  See Mejia, 99 Cal. App.4th at 1456-57.

27      [21]Plaintiffs have not argued that they meet an exception to the privity requirement.

28  daw                                  33

1  "seller" must have reason to know that the buyer is relying.  See Keith v. Buchanan, 173

2  Cal.App.3d 13, 25 (1985); CACI § 1232.  The seller in this case was ALD, not Defendant.

3      Finally, as previously discussed above, the holster was a negligible, insubstantial, or

4  theoretical factor in the shooting of Torres.  As the holster was not a substantial cause in the

5  shooting, the failure of the holster to be as warranted or of the expected quality could not be said

6  to be a substantial factor in the shooting.[22]  See CACI §§ 1230, 1231.

7      For the above reasons, summary judgment in favor of Defendant on this claim is

8  appropriate.

9

10  **D.    NEGLIGENCE**

11      *1.    Negligent Warning*

12      A manufacturer has a duty to use reasonable care to warn of the dangerous condition of

13  the product or of the facts that make it likely to be dangerous to anticipated users if the

14  manufacturer has reason to believe that the users will not realize its dangerous condition.  See

15  Putensen v. Clay Adams, Inc., 12 Cal.App.3d 1062, 1076-77 (1970).  In other words, a warning

16  should be given if the manufacturer "has no reason to believe that those for whose use the

17  product is supplied will realize its dangerous condition."  Stevens, 9 Cal.3d at 64 (quoting

18  Restatement 2d Torts § 388); CACI § 1222.

19      As discussed under the strict liability section for failure to warn/inadequate warning, the

20  evidence shows that Noriega had pulled the wrong weapon in the field months prior to the Torres

21  shooting and was concerned enough to tell her supervisor.  The testimony of Sergeant Lawson

22

23  _____

24      [22]Also, from the deposition excerpts of Officer Williams, it appears that Williams, Frazier, Noblett and
   Jeffries discussed what kind of holster to purchase and whether to purchase the Defendant's designed holster or
   whether there were alternatives.  See Deposition of Randy Williams at 45:4-9 & 46:5-47:3.  The officers discussed

25  on which side to wear the holster, how it was to be worn on the belt, and muscle memory.  See id. at 46:21-47:3.
   Williams testified that the officers were not aware of many alternative holsters and believed that the easiest thing to
   do was to purchase Defendant's holster.  See id. at 45:10-13.  Given the discussions that occurred, Williams's

26  deposition testimony points against reliance on any recommendation by Defendant, an essential element of the
   implied warranty of fitness.  See Keith, 173 Cal.App.3d at 25; CACI § 1232.

27

28  daw                                          34

also shows that he told Noriega to practice (which Noriega was doing through October 2002) with her Glock and her taser so that there would be no "confusion."  Finally, the testimony of Officer Williams suggests that there was likely a discussion about the possibility of weapons confusion in connection with the decision on the holster.  Plaintiffs were thus aware of the alleged danger of weapons confusion and the M26 approximately one year before the Torres shooting.  Given this awareness of the possibility of weapons confusion, it is unclear how the failure to give a warning about weapons confusion could be a substantial factor in the shooting.  Furthermore, given the allegations and position of Plaintiffs that what made the M26 dangerous was its similarity in shape and functionality to a handgun, the danger of "weapons confusion" is obvious and readily recognizable/"realizable" especially when the M26 and a handgun are worn close together.  There is no duty to warn of obvious dangers or dangers that are readily recognizable.  See Stevens, 9 Cal.3d at 64; Plenger, 11 Cal.App.4th at 362; Krawitz, 209 Cal.App.3d at 966; Gonzales, 192 Cal.App.3d at 1151-52; Aguayo, 183 Cal.App.3d at 1042; Lee, 169 Cal.App.3d at 387; Holmes, 133 Cal.App.3d at 220; Burke, 86 Cal.App.3d at 772; Bojorquez, 62 Cal.App.3d at 933-34; Putensen, 12 Cal.App.3d at 1076-77; CACI § 1222. Accordingly, summary judgment in favor of Defendant on this claim is appropriate.[23]

### 2.    Negligent Training/Training Materials

Defendant argues that Plaintiffs' claim of negligent training for not training on the possibility of weapons confusion or failing to warn of weapons confusion is meritless. Defendant argues that it provided no direct training to Plaintiffs, rather Madera officers received training from Lewis, and those officers trained the remaining Madera officers, including Noriega. Defendant argues that it has no control over how Madera officers Dilbeck, Autry and Ballard

---

[23]The same analysis and rationale, as discussed both in this section as well as the strict liability failure to warn section, applies to the holster negligence claims.  Because the risks of the holster alleged by Plaintiffs were obvious, i.e. readily recognizable without a warning, or known because of Noriega's prior conduct, and because there has been insufficient argument and evidence to show that the holster was a substantial cause of the shooting, and because it is not clear that "weapons confusion" is a danger associated with a holster, summary judgment in favor of Defendant on this claim is appropriate.

1  actually trained Noriega or whether they ultimately failed to provide training.  Rather, it was up

2  to the Madera PD to tailor the training for their own department in accordance with their own

3  policies.  Defendant also argues that Noriega approached her sergeant about her weapons

4  confusion problem and, in response, Sergeant Lawson simply told her to continue to practice so

5  that she would not have confusion.  Defendant argues that this shows that Lawson evaluated the

6  problem and determined that no additional training was needed, rather, she simply needed to

7  practice more.

8          *Plaintiffs' Opposition*

9          Plaintiffs agree that Lewis is a certified master instructor and that he used Defendant's

10  materials to teach the Madera instructors (Dilbeck, Autry, and Ballard).  However, Defendant

11  remained intimately involved in the training provided to the Madera officers as well as the end

12  users of its products.  First, Lewis could not become a master instructor until he had been

13  approved by Defendant.  As a master instructor, Lewis was also required to teach from lesson

14  plans developed and controlled by Defendant.  See Deposition of Stephen Tuttle at 37.  Lewis

15  provided the three Madera instructors with Defendant's CD-ROM's and other materials and

16  lesson plans "to use when training the end users such as Officer Noriega."  Also, Defendant gave

17  Madera PD a training voucher, and Defendant's CEO admits that Defendant provides an 8 hour

18  course to train others to become instructors.  Further, Defendant admits that it continued to send

19  training bulletins to clients, including Madera, to keep in touch with clients and provide updated

20  training information.  Thus, virtually every aspect of the initial and ongoing training provided to

21  Noriega was directly controlled and developed by Defendant.

22          *Discussion*

23          It is undisputed that the individuals who actually taught Noriega how to use the Taser

24  M26 were fellow members of the Madera PD, Dilbeck, Autry, and Ballard.  Those officers were

25  taught by London Lewis, an employee of ALD, who used materials provided by Defendant.

26  Lewis was certified as a master instructor by Defendant, and Defendant required that master

27

28  daw                                            36

1   instructors teach from a lesson plan and materials provided by Defendant.  This chain shows that

2   Defendant did not directly train Noriega.  The only way that Defendant could be said to have

3   trained Noriega is through two filters:  Lewis and then the Madera instructors.  There is no

4   evidence concerning how Dilbeck, Autry, and Ballard actually trained Noriega and there is no

5   evidence that Defendant actually controlled Dilbeck, Autry, and Ballard.  It is apparently only

6   undisputed that Dilbeck, Autry, and Ballard used the lesson plan and materials prepared by

7   Defendant, which included blank areas for individual departments's policies, to train Noriega.

8   See DUMSF No. 3.  Because Defendant did not actually train Noriega, at best any negligence in

9   the training of Noriega would have to flow to Defendant through the training materials/lesson

10  plan.

11         Plaintiffs's negligent training/training materials claim is essentially that Defendant failed

12  to warn them or provided negligent training about the possibility of weapons confusion.[24]

13  Viewed in the context of training through lesson plans or materials, this is simply a variation on

14  the claim of failure to warn about weapons confusion.  As discussed in other portions of this

15  order, there is no duty to warn about either obvious risks or risks that are known to the Plaintiffs.

16  Again, as discussed above, Plaintiffs were aware of the possibility of weapons confusion and/or

17  Noriega's personal confusion issues through Noriega's own reporting of the prior incident to Sgt.

18  Lawson.  Moreover, assuming that the M26 is defectively or dangerously similar to a firearm,

19  then the risk of confusion when the M26 is worn next to a firearm is obvious.  Because there was

20  no duty for Defendant to warn or train about the possibility of weapons confusion, there is no

21

22

_____

23         [24]This is the characterization of Plaintiffs' claims by Defendant in the additional briefing regarding
    negligent training.  See Defendant's Additional Briefing In Support of Motion For Summary Judgment On Plaintiffs'
24  Claim For Negligent Training at 3:18-21.  Plaintiffs' operative complaint only generally alleges negligent
    training/training materials and is not specific.  Also, the manner in which Plaintiffs argue negligent training focuses
25  on indirect contacts between Defendant and Plaintiffs.  Significantly, Plaintiffs did not respond to or oppose
    Defendant's characterization of their negligent training/training materials claim.  Given the generality of Plaintiffs'
26  complaint, the nature of Plaintiffs' opposition, and Plaintiffs' failure to challenge/clarify Defendant's
    characterization of their claims, the Court takes Plaintiffs's claim of negligent training/training materials to be based
27  on the failure to warn or providing negligent training regarding the possibility of weapons confusion.

28  daw                                                    37

1    actionable negligence.[25]   See Waste Management, Inc. v. Superior Court, 119 Cal.App.4th 105,

2    109 (2004).  Summary judgment is appropriate on this claim.

3         ***3.      Negligent Design***

4         In a negligent design claim, the focus is on the reasonableness of the manufacturer's

5    conduct, as opposed to the condition of the product itself.  See Barker, 20 Cal.3d at 434; West v.

6    Johnson & Johnson Products, Inc., 174 Cal.App.3d 831, 856 (1985).  In a negligent design case,

7    in contrast to strict liability, the plaintiff must show that "the defect in the product was due to

8    negligence of the defendant."  Merrill v. Navegar, Inc., 26 Cal.4th 465, 479 (2001).  A

9    manufacturer must utilize reasonable care to design a product so "as to make it not accident-

10

11

12   [25]There is also an indication that weapons confusion was discussed by London Lewis during the training of
     Dilbeck, Autry, and Ballard.  Although neither party has cited to this testimony, London Lewis testified in deposition
     that he discussed the benefits of a weak side draw during Dilbeck, Autry, and Ballard's training session.  As part of
13   that discussion, Lewis indicated that an advantage to wearing the taser on the weak side was that there would be a
     "clear-cut" difference in an officer's mind between weapons location.  Lewis testified:

14
          Q:     Was there any discussion during this class regarding the disadvantages or the advantages of
15               carrying a taser on the officer's weak side?

16        A:     **The advantage being there is a very clear-cut difference in your brain patterns between
                 drawing from your normal weapon location and reaching across the body and drawing from
17               the non-dominant side.  It's a very different motion, and so, therefore, is inherently less
                 confusable.**

18
                 **It's a comfortable draw for a lot of people.  It's relatively easy and fast to do.  But some
19               people do find it awkward.**

20               **So a possible response to that that was brought up was what we call a weak-hand draw,
                 where instead of using your right hand to reach over, you use a left-handed holster on the
21               left-hand side, and you simply, because it's an ambidextrous weapon, draw with your left
                 hand and either use the weapon with your left hand or strip it into your right hand and
22               make the transition to a right-handed usage.**
                 . . . . . . . . . . . . . .
23        Q:     After – either during the class or after the class, or after the discussion on the holstering issue, was
                 there any kind of consensus from the Madera police officers who attended your training session
24               about where they were going to carry[] their tasers or what recommendations they were going to
                 make with regard to that issue?
25
          A:     **I don't recall them reaching any consensus.  I recall there was a lot of discussion about the
26               subject, but I don't recall if they leaned on a particular answer at that time.**

27   Deposition of London Lewis at 131:1-20; 132:14-24.

28   daw                                    38

proof, but safe for the use for which it was intended." <u>Pike v. Frank G. Hough Co.</u>, 2 Cal. 3d 465, 470 (1970).  Reasonable care varies with the facts of each case, "but it involves a balancing of the likelihood of harm to be expected from a machine with a given design and the gravity of harm if it happens against the burden of the precaution which would be effective to avoid the harm." <u>Id.</u>; <u>see also</u> <u>Merrill</u>, 26 Cal.4th at 479.  There is a similarity between strict liability under the risk/benefit test for design defect and negligent design.  <u>See</u> <u>Merrill</u>, 26 Cal.4th at 480.  "To say that a product was 'negligently designed' is to say it 'was defective, for purposes of establishing liability under a theory of negligence.'"  <u>Id.</u>  If there is no design defect, then there can be no liability for negligent design.  <u>See</u> <u>Lambert v. General Motors</u>, 67 Cal.App.4th 1179, 1184-85 (1998).

Also, an essential element of plaintiffs' cause of action, whether based on strict liability or negligence, is the existence of a causal link between defendant's act and plaintiff's injury.  <u>See</u> <u>Merrill</u>, 26 Cal.4th at 479; <u>Smith v. Lockheed Propulsion Co.</u>, 247 Cal.App.2d 774, 780 (1967); <u>Spencer v. Beatty Safway Scaffold Co.</u>, 141 Cal.App.2d 875, 880 (1956) (noting that "mere proof of negligence" is insufficient to establish liability, unless such negligence is causally connected or "fastened to the injury").  The burden of proof with respect to causation rests with the plaintiff/injured party.  <u>See</u> <u>Vasquez v. Residential Investments, Inc.</u>, 118 Cal.App.4th 269, 288 (2004); <u>Spencer</u>, 141 Cal.App.2d at 882.  A plaintiff must show that the negligent design of the product was a substantial factor in bringing about the harm suffered.  <u>See</u> <u>Whiteley v. Phillip Morris, Inc.</u>, 117 Cal.App.4th 635, 703 (2004); CACI § 1220.  Although undue emphasis should not be placed on the word "substantial," something which plays only a "negligible," "infinitesimal" or "theoretical" part in bringing about an injury, damage or loss is not a substantial factor.  <u>See</u> <u>Kennedy</u>, 268 F.3d at 770-71; <u>Bockrath</u>, 21 Cal.4th at 79; <u>Rutherford</u>, 16 Cal.4th at 969; <u>see also</u> CACI § 430.

                    **a.    Taser M26**

Defendant argues that the Taser looks generally like a firearm, but has differences in the

1  shape, weight, width, trigger, and safety.[26]  Defendant argues that the M26 was designed after

2  significant input from law enforcement experts to determine which configuration was optimal.[27]

3  Also, Defendant argues that there is no causation because the taser was not used.  Defendant

4  contends that there is no evidence that any redesign of the M26 would have made any difference

5  under the facts of this case.  Because Noriega testified that she did not touch the M26, did not

6  reach for the M26, and did not look at the weapon that she shot Torres with, a different design

7  would not have made a difference – the confusion was not based on the appearance or design of

8  the M26.  Indeed, the M26 was fully encased within its holster, except for the handle.  Because

9  the M26 was in the holster, it is inexplicable and illogical to argue that Noriega was confused by

10  the M26's design and appearance given that she did not see it.  Plaintiffs must make a prima facie

11  showing that the injury was proximately caused by the product's design.  Defendant argues that

12  Plaintiffs cannot meet this burden of showing that another design would have made a difference

13  as Noriega testified that she never touched or looked at the M26 or looked at the weapon in her

14  hand.  Thus, Noriega's confusion was based on some other unknown factors.[28]

15      *Plaintiffs' Opposition*

16      Plaintiffs argue that Defendant's CEO testified that the M26 was "shaped and designed to

17  function like a standard handgun" so that "the officer could use the same muscle memory and

18  training that they had for the use of their handgun."  See Deposition of Patrick Smith at 126-27.

19  Plaintiffs also point out that Smith testified that the M26's design made "it easy for law

20  enforcement officers to use during stressful situations since their firearms training familiarizes

21

22

---

23      [26]Defendant, however, has provided no evidence to support these assertions.

24      [27]Defendant does not provide specific information regarding input from law enforcement experts.  Smith's
deposition indicates that Defendant conducted research and received input, but the quantity and quality and nature of
25  the input is not clear.  See Smith Deposition at 126-128.

26      [28]Additional briefing was ordered with regard to the existence of a design defect and the duty of care.
However, Defendant has not adequately addressed the existence of a design defect or adequately described or
27  provided evidence regarding its conduct in meeting the duty of care in the design of the M26.

28  daw                                          40

1  them with the muscle movement required for its operation." Id.[29]  Because the M26 was shaped

2  and designed to function like a gun, Plaintiffs argue that Officer Noriega thought that she was

3  utilizing her M26 when in fact she had her Glock.  But for these similarities in design and

4  function of the M26 with a gun, Torres would not have been shot.  The design of the M26 was

5  intended to be similarly shaped and function as a handgun and was a substantial factor in the

6  death of Torres.

7      *Discussion*

8      The emphasis of Defendant's causation argument is that Noriega never touched, never

9  looked at or saw, and never used the M26 – because Noriega never saw or touched the M26,

10 there is no way that she could have been confused by it.  In other words, Defendant argues that

11 neither its conduct nor the M26 caused the shooting.

12     Plaintiffs's opposition is rather general and relies primarily on Patrick Smith's testimony

13 regarding the general characteristics of the M26.  After citing to Smith's testimony, Plaintiffs

14 conclude without citation to evidence that what happened to Noriega was she was confused

15 because of the shape, functionality, and muscle memory characteristics of the M26.  Plaintiffs

16

_____

17     [29]In response to Defendant's argument that Noriega never touched or looked at her M26, Plaintiffs argue
that Defendant's own expert, Sid Heal, testified that officers are not trained to look at weapons, but at the "laser dot"
18 site.  See Deposition of Sid Heal at 35.  At the time of submission, only a rough draft copy of Heal's deposition was
available.  See Plaintiffs' Opposition to Summary Judgment Re: Holster at 3 n.1.  Defendant has objected to use of
19 Heal's deposition excerpt on the basis that the excerpt has not been properly authenticated, specifically that the
excerpt lacks the reporter's certification.  See Orr v. Bank of America, NT & SA, 285 F.3d 767, 774 (9th Cir. 2002).
20 Plaintiffs respond through declaration of counsel that Heal has submitted his corrections to the deposition and there
were no corrections on the excerpted page.  However, as explained by Orr:
21          A deposition or an extract therefrom is authenticated in a motion for summary judgment when it
            identifies the names of the deponent and the action and includes the reporter's certification that the
22          deposition is a true record of the testimony of the deponent.  Ordinarily, this would have to be
            accomplished by attaching the cover page of the deposition and the reporter's certification to every
23          deposition extract submitted.  It is insufficient for a party to submit, without more, an affidavit from
            her counsel identifying the names of the deponent, the reporter, and the action and stating that the
24          deposition is a "true and correct copy."  Such an affidavit lacks foundation even if the affiant
            counsel were present at the deposition.
25 Orr, 258 F.3d at 774.
Plaintiffs' declaration regarding corrections made by Heal does not address Defendant's authentication objection.
26 Plaintiffs have filed no further supplements or attempted to lodge the deposition Heal or requested additional time to
properly authenticate the deposition.  Defendant's objection under Orr is well taken and the purported deposition
27 excerpts of Sid Heal will not be considered as they are not properly authenticated.  See Orr, 285 F.3d at 774.

28 daw                                                    41

assume that this similarity applies to a Glock, that Noriega was actually confused because of this

similarity (presumably because of the "feel" of the M26 compared with a Glock), and that the

confusion was reasonable.  However, Noriega's testimony is not detailed in this respect.  The

parties have cited to various portions of Noriega's deposition from pages 125 to 177.  In those

pages, Noriega indicates only that she reached for and thought she had her M26.

> Q:    What occurred?
>
> **A:    I was yelling at him to stop or he was going to be tased.  I continued to tell
> him to stop or he was going to be tased.  And when I opened the door, he
> kicked and it pushed the door into me, and I stopped the door.  At the same
> time that I stopped the door, I reached down for my taser.  And when I came
> up, I pulled the trigger, and I thought it was my taser, but it was my gun.**

Noriega Deposition, Vol. I, at 125:18-126:1.

> Q:    When you reached for your weapon that ultimately killed Mr. Torres, what
> weapon was that?
>
> **A:    I was reaching for my taser.**

Id. at 129:24-130:1.

> Q:    You were trying to reach for the taser on your thigh when you reached for your
> upper waist; is that correct?
>
> . . . . . .
>
> Q:    Your waist, correct?
>
> **A:    Correct.**

Id. at 171:2-9.

The above excerpts are the only portions of the deposition between pages 125 and 177

where Noriega mentions trying to reach for her M26 or describes the shooting.  Although

Noriega testified that the M26 and the Glock were approximately the same length, see id. at

170:7-9, Noriega never describes the M26 or her Glock or explains how or why she was

confused or what made her think that she had her M26 when she actually had her Glock.  In fact,

after Noriega testified that she knew that she had shot Torres because she did not hear "clicking,"

she testified that she could not remember the way the trigger felt, did not remember the way the

handle felt, did not look at the gun, and did not remember looking at the back of the gun.  See id.

at 143:13-144:2.  There is no indication that Noriega remembers how either the M26 or the Glock, or parts thereof, "feel," comparatively speaking.  There is simply no evidence that specifically shows why or how Noriega believed that she had her M26 when in fact she had her Glock.

Plaintiffs are attempting to bootstrap the general characteristics of the M26 to the specific causation of this case without express links.  Smith's testimony indicates only that the M26 is generally shaped like a handgun and is generally similar in functionality to a handgun so that the same type of muscle memory can be used.  Plaintiffs have not produced evidence regarding the actual weight or size of the M26 versus a Glock or offered evidence regarding the specific design features such as handgrip or the "feel" of each weapon.  There is no evidence, including lay or expert opinions, that a police officer would reasonably confuse the weight, shape, or feel of the weapons because of the similarity of these characteristics under the facts of this case, i.e. the officer does not look at the weapon being used.   The only evidence is that:  Noriega parried the car door, she reached to her waist to attempt to grab her M26 even though the Glock was holstered at her waist and the M26 was holstered under her Glock on her thigh, she cannot remember the feel of the weapon that was in her hand, she did not look at the weapon in her hand, and she shot Torres.  Additionally, Noriega had been using and practicing drawing the M26 for approximately one year at the order of Sgt. Lawson.  Even when combined with Smith's testimony regarding the general characteristics of the M26, the evidence does not show how the M26 or Defendant's conduct was a substantial factor in causing this particular shooting by Noriega.

Once Defendant showed the lack of causation, it was incumbent upon Plaintiffs to offer specific evidence, through declarations or otherwise, to raise a genuine issue of material fact regarding causation.  See Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc); Willis, 244 F.3d at 682; Fairbank v. Johnson, 212 F.3d 528, 532 (9th Cir. 2000).  Plaintiffs have not done so.  Accordingly, summary judgment is appropriate as to this claim.

1          **b.      Holster for the Taser M26**

2          Defendant argues that any design defect or failure to warn could not have contributed to

3    the shooting of Torres.  Given the facts, Defendant argues that for Plaintiffs to argue that Noriega

4    was confused by the presence of another device on her body relies on convoluted facts and that

5    Noriega may as well argue that she was confused because she was under stress or had the door

6    kicked into her.  Defendant also emphasizes that Noriega herself had strapped her M26 and

7    holster on her person and had been wearing the M26 and holster for approximately one year as

8    per Madera PD policy.  Accordingly, Defendant argues that the none of its conduct was a

9    substantial factor in the shooting of Torres.

10          *Plaintiffs' Opposition*

11          Plaintiffs argue that they only need to establish that the defective design of the holster

12   was a substantial factor in causing the shooting.  Under *Rutherford*, Plaintiffs need only establish

13   that Defendant contributed to the shooting.  See *Rutherford*, 16 Cal.4th at 977.  Further,

14   Defendant cannot avoid responsibility just because some other person, condition or event was

15   also a substantial factor in causing harm.  See CACI § 431.  Plaintiffs also argue that Defendant's

16   arguments lack the factual support required by Rule 56(e).  Additionally, despite Defendant's

17   argument that Plaintiffs' position is absurd, no less than four police officers nationwide have

18   been documented to have this "illogical" confusion.[30]  Plaintiffs argue that, without repeating the

19   previously outlined issues, it is clear that a jury could infer liability from Defendant's defectively

20   designed equipment and that the holster and the M26 were substantial factors in the shooting.

21          *Discussion*

22          The arguments from the parties with regard to causation and negligent design of the

23   holster are essentially identical to the arguments made with respect to the M26.  Plaintiffs do not

24   cite to any specific evidence relating to the holster and the shooting and do not cite to any

25

26          [30]Plaintiffs refer to Noriega, the officers in Rochester, MN and Sacramento, CA and an officer in Maryland

27   which has come to the attention of the Court through submissions by the Torreses on an unrelated motion.

28   daw                                    44

1   testimony by Officer Noriega.  As with Plaintiffs' negligent design claim regarding the M26,

2   Plaintiffs seem to make only a general argument that the holster was a substantial factor in the

3   shooting.  However, Plaintiffs do not show or present specific evidence to show how the holster

4   or the conduct of Defendant was actually a substantial factor in the shooting.[31]   From Plaintiffs's

5   opposition papers, the apparent problem with the holster was that it gave the officer only two

6   options – (1) wear it on the dominant side (without disclosing two weapon confusion incidents)

7   or, (2) wear it on the undesirable non-dominant side in cross-draw configuration with a high risk

8   [to] officer safety."  Plaintiffs' Opposition to Summary Judgment Re: Holster Claims at 7.  The

9   evidence shows that the Madera PD, however, chose to have to have the holster worn on the

10  dominant side in a strong draw fashion.  See Williams Deposition at 46:19-47:3; 48:20-49:8.

11  Like Plaintiffs' claims regarding the negligent design of the M26, there is no evidence, including

12  lay or expert opinion, that explains how the thigh holster or the conduct of Defendant was a

13  substantial factor in the shooting.

14      Once Defendant showed the lack of causation, it was incumbent upon Plaintiffs to offer

15  specific evidence, through declarations or otherwise, to raise a genuine issue of material fact

16  regarding causation.  See Devereaux, 263 F.3d at 1076; Willis, 244 F.3d at 682; Fairbank, 212

17  F.3d at 532.  Instead, Plaintiffs have only made a rather conclusory argument that the holster was

18  a substantial factor in the shooting.

19      Additionally, Plaintiffs attempt to argue that the risks of the design of the thigh holster

20  outweigh the benefits under the risk/benefits tests.  As part of this argument, Plaintiffs state:

21  "given that the only holster manufactured, recommended, and offered by Taser (and ALD) was

22  one which required officers to either be exposed to a weapon confusion issue (known only to

23

24      [31]Noriega's deposition does indicate that the holster had a tendency to move or "ride up," but Noriega also

25  testified that she and the other officers were aware of this tendency and that different holsters had been ordered but
    would first be given to the tactical team.  See Noriega Deposition, Vol. I, at 134:15-137:2. There is no testimony that

26  the holster actually had moved at the time of the shooting.  More importantly, Plaintiffs have not identified, cited,
    mentioned, or argued the tendency of the thigh holster to move as a defect or as negligent and have in no way relied

27  on this in their oppositions.

28  daw                                              45

Taser at the time) or incur a substantial risk of officer safety with the cross-draw configuration of the same holster, the risk to officers and the foreseeable public was substantial . . . Quite frankly, Taser has never really identified any disadvantage to designing a holster which they would recommend officers carry in a non-dominant position." Plaintiffs' Opposition to Summary Judgment Re: Holster Claim at 7:25-8:24. The defect that is attempted to be identified by Plaintiffs is that Defendant manufactured only one holster that could only be used on the dominant side or in a cross-draw and did not have a holster that could be worn in a non-dominant position. However, as discussed previously, Defendant made both right-sided and left-sided holsters and the Madera PD purchased both. See Deposition of London Lewis at 171:3-12; Exhibit 4 to the Declaration of Bruce Praet; March 28, 2005, Declaration of Stephen Tuttle at ¶¶ 5-6. For a right-handed individual, use of a left-sided holster allows for a non-dominant draw. See Deposition of London Lewis at 131:4-20. In other words, Defendant did manufacture a holster that allowed for a weak side or non-dominant draw. Furthermore, it is unclear how any holster designed to be worn on the dominant side would not place the taser in close proximity to an officer's firearm (assuming that the officer wears the firearm on the dominant side). Plaintiffs attempt to show a design defect with the holster, but the defect seems to be based on a faulty premise. When there is no design defect, there is no negligent design. See Lambert, 67 Cal.App.4th at 1184-85 (and cases cited therein).

In light of the above reasons, summary judgment in favor of Defendant is appropriate on this claim.


**E.    EQUITABLE INDEMNITY**

Defendant argues that, under California law, the doctrine of equitable indemnity applies only between defendants who are jointly and severally liable to the underlying plaintiff. See BFGC Architects Planners, Inc. v. Forcum/Mackey Construction, Inc., 119 Cal.App.4th 848, 852 (2004). Specifically, there must be some basis for tort liability against the proposed indemnitor,

1  including vicarious liability, or else the proposed indemnitor must owe the indemnitee some duty

2  pursuant to the doctrine of implied contractual indemnity.  See id.  Here, the undisputed facts

3  show that no such elements exist in the instant case.  Defendant has no liability whatsoever to

4  Everardo Torres, deceased.  Since there is no privity between Defendant and Plaintiffs, there can

5  be no implied contractual indemnity.

6       *Legal Standard*

7       California courts have adopted the equitable indemnity rule to ensure that "liability for an

8  indivisible injury caused by concurrent tortfeasors [would] be borne by each individual tortfeasor

9  'in direct proportion to [his] respective fault . . . .'"  GMC v. Doupnik, 1 F.3d 862, 865-66 (9th

10  Cir. 1993) (citing American Motorcycle Ass'n v. Superior Court, 20 Cal. 3d 578, 598 (1978));

11  see also Tatum v. Armor Elevator Co., 203 Cal. App. 3d 1315, 1319-1320 (1988) (equitable

12  indemnity is intended to prevent unjust enrichment of one party at the expense of another).

13  However, California law permits a concurrent tortfeasor to obtain equitable indemnity only from

14  another concurrent tortfeasor.  See GMC, 1 F.3d at 866 (citing Munoz v. Davis, 141 Cal. App. 3d

15  420, 425(1983) ("There can be no indemnity without liability[;] . . . unless the prospective

16  indemnitor and indemnitee are jointly and severally liable to the plaintiff there is no basis for

17  indemnity.")); see also Gem Developers v. Hallcraft Homes of San Diego, Inc., 213 Cal. App. 3d

18  419, 430 (1989).  "Indeed, a right to indemnity exists only if the injured party has a legal cause of

19  action against both the indemnitor and the indemnitee."  See GMC, 1 F.3d at 866 (citing New

20  Hampshire Ins. Co. v. Sauer, 83 Cal.App.3d 454, 459 (1978)).  Stated differently, "a

21  defendant/indemnitee may in an action for indemnity seek apportionment of the loss on any

22  theory that was available to plaintiff upon which the plaintiff would have been successful."  Leko

23  v. Cornerstone Bldg. Inspection Serv., 86 Cal.App.4th 1109, 1115 (2001).

24       *Discussion*

25       The causes of action relied on for equitable indemnity by Plaintiffs are strict products

26  liability, negligence, and breach of express and implied warranties.  As discussed above,

27

28  daw                                               47

summary judgment in favor of Defendant on each of these theories is appropriate.  Because no

other causes of action or theories appear to be available to the Torres plaintiffs which would have

been successful, summary judgment in favor of Defendant is appropriate.  See GMC, 1 F.3d at

866; BFGC Architects Planners, Inc., 119 Cal.App.4th at 852; Leko, 86 Cal.App.4th at 1115.


### CONCLUSION

Defendants have now moved for summary judgment on the claims by Plaintiffs which

serve as the basis for equitable indemnity: strict products liability, breach of warranties, and

negligence.

With respect to strict products liability under design defect theory, the evidence indicates

that the M26 was not "used" during the shooting of Torres.  Because use is a requirement under

the risk/benefit design defect theory, summary judgment in favor of Defendant is appropriate.

Similarly, the taser thigh holster was not used in the shooting.  Moreover, the defect identified by

Plaintiffs appears to be based on a faulty premise and Plaintiffs have not shown that the holster

was anything but an insubstantial or negligible factor in the shooting of Torres.  Accordingly,

summary judgment is appropriate on these claims.

With respect to the failure to warn, the evidence indicates that Plaintiffs were aware of

the possibility of weapons confusion, especially Noriega's own tendency in light of her prior

incident which she disclosed to Sgt. Lawson.  Moreover, assuming that Plaintiffs's allegations

that the M26 is defectively similar to a handgun in functionality, design, and muscle memory,

then the possibility of weapons confusion is obvious, especially when the M26 is worn close to a

firearm.  Under these circumstances, there is no duty to warn.  The same is also true of the

holster.  With respect to "training," training is a service and thus, not subject to strict products

liability.  With respect to training materials, the evidence suggests that the materials were used

incidentally to the provision of training, a service.  Moreover, Plaintiffs have failed to show how

the training materials are sufficiently like aeronautical charts such that the materials could be

considered products.  Rather, the evidence suggests that they are more comparable to printed

works, which are not subject to strict products liability theories.  Accordingly, summary

judgment is appropriate on these claims.

With respect to Plaintiffs's breach of warranty claims, privity is a requirement for both

express and implied warranties in California.  The evidence shows that ALD, not Defendant, sold

the M26's and holsters to Plaintiffs.  Plaintiffs have not shown sufficient conduct under *U.S.*

*Roofing* to establish privity, nor have they presented sufficient evidence to establish agency.

Because Plaintiffs have failed to show that they are in privity with Defendant, summary judgment

is appropriate as to these claims.

With respect to Plaintiffs's negligence claims, Plaintiffs's negligent warning claim is not

persuasive because, as discussed under strict liability, there is no duty to warn of obvious, readily

recognizable risks, or risks that a person is already aware.  The evidence shows that the risk of

weapons confusion was already known to Plaintiffs and/or readily recognizable or obvious.

There is thus, no duty to warn.  Plaintiffs's negligent training/training materials claim is

essentially a variation on the failure to warn claim.  Because there was no duty to warn under the

facts of this case, there is no actionable negligence under Plaintiffs's negligent training claims.

With respect to negligent design of the M26 and the holster, Plaintiffs have made only general

and conclusory arguments.  Noriega's testimony is only general and there is never an explanation

or a link between the conduct of Defendant/negligent design of the M26 and holster and the

shooting.  In other words, Plaintiffs have not presented specific evidence that shows how the

conduct of Defendant/negligent design of the M26 and holster was actually a substantial factor in

this shooting by Noriega.  Accordingly, summary judgment is appropriate as to these claims.

Finally, in order for Plaintiffs to be entitled to equitable indemnification, there must be a

cause of action that the Torreses would have been successful against Defendant.  Summary

judgment is appropriate as to the only causes of action relied on by Plaintiffs as the basis for

indemnity (strict products liability, negligence, and breach of warranty).  Because there appears

to be no identifiable theory that the Torres-plaintiffs could recover as to Defendant, summary judgment is appropriate.


Accordingly, IT IS HEREBY ORDERED that Defendant Taser International's motions for summary judgment are GRANTED.


IT IS SO ORDERED.

**Dated:    July 11, 2005   **                          _____/s/ Anthony W. Ishii_____
0m8i78                                                   UNITED STATES DISTRICT JUDGE

daw

50