IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MARIA TORRES and MELCHOR TORRES, individually and as Administrators of the Estate of EVERARDO TORRES, | ) ) ) ) | 1: 02-CV-6385 AWI GSA |
| | ) | MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR SUMMARY ADJUDICATION |
| Plaintiffs, | ) ) | |
| v. | ) | ORDER REQUIRING STATUS REPORTS WITHIN FIFTEEN DAYS |
| | ) | |
| CITY OF MADERA, et al.,, | ) | |
| | ) | (Document #196) |
| Defendants. | ) | |
| _____ | ) | |

**BACKGROUND**

This action arises from the shooting death of Everardo Torres ("Torres") by Officer Marcy Noriega ("Defendant Noriega") while she was working for the Madera Police Department. Torres's estate and family ("Plaintiffs") have sued Defendant Noriega and the City of Madera ("Defendants") under 42 U.S.C. § 1983 and state law.

On April 8, 2005, the court granted Defendants' motion for summary judgment on Plaintiffs' Fourth Amendment claim.   The court ruled that Defendant Noriega's accidental shooting of Torres with her Glock handgun rather than the intended M26 Taser ("Taser") did not constitute a "seizure" under the Fourth Amendment.   Plaintiffs did not oppose summary judgment on the remaining federal claims based on alleged Fourteenth Amendment violations

1   and the City of Madera's liability under <u>Monell</u>.   The court denied summary judgment on the

2   state law claims.

3   Pursuant to Plaintiffs' request, the court directed entry of final judgment on the Fourth

4   Amendment claim pursuant to Rule 54 of the Federal Rules of Civil Procedure, and Plaintiffs

5   appealed.  On appeal**,** the Ninth Circuit reversed this court's grant of summary judgment

6   applying the"continuing seizure" doctrine, which had never been raised by any of the parties in

7   either this court or on appeal.   <u>See</u>  <u>Torres v. Madera</u>, 524 F3d 1053 (9th Cir. 2008) (hereinafter

8   "<u>Torres I</u>").  The Ninth Circuit found Torres had been technically seized from the moment he

9   was handcuffed, prior to the shooting.   As such, the Ninth Circuit found the issue in this action

10   is the reasonableness of Defendant Noriega's mistake, not whether Defendant Noriega seized

11   Torres.   The Ninth Circuit then remanded the action to this court.

12   On January 8, 2009, Defendants filed a motion for summary adjudication of issues,

13   statement of undisputed facts in support thereof, and exhibits.   Defendants contend that they are

14   entitled to summary judgment on the Fourth Amendment claim because Defendant Noriega's

15   mistake was objectively reasonable.   In the alternative, Defendants contend that Defendant

16   Noriega is entitled to qualified immunity.

17   On March 20, 2009, Plaintiffs filed an opposition to the motion for summary

18   adjudication.  Plaintiffs also submitted their response to Defendants' statement of undisputed

19   facts, Plaintiffs' additional facts, and supporting exhibits.  Plaintiffs contends that neither

20   Defendant Noriega's use of her Taser nor her Glock were reasonable.

21   On April 3, 2009, Defendants filed their reply to Plaintiffs' opposition to the motion for

22   summary adjudication.

23   **LEGAL STANDARD**

24   Summary judgment is appropriate when it is demonstrated that there exists no genuine

25   issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

26   Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970); <u>Poller v.</u>

27

28   2

1  Columbia Broadcast System, 368 U.S. 464, 467 (1962);  Southern California Gas Co. v. City of

2  Santa Ana, 336 F.3d 885, 888 (9th Cir 2003).

3              Under summary judgment practice, the moving party
               [A]lways bears the initial responsibility of informing the district
4              court of the basis for its motion, and identifying those portions of
               "the pleadings, depositions, answers to interrogatories, and
5              admissions on file, together with the affidavits, if any," which it
               believes demonstrate the absence of a genuine issue of material
6              fact.

7  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);  Miller v. Glenn Miller Productions, Inc., 454

8  F.3d 975, 987 (9th Cir. 2006).  A fact is material if it could affect the outcome of the suit under

9  the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

10  Miller, 454 F.3d at 987.   "[W]here the nonmoving party will bear the burden of proof at trial on

11  a dispositive issue, a summary judgment motion may properly be made in reliance solely on the

12  'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.;  Fortyune v.

13  American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  Indeed, summary judgment

14  should be entered after adequate time for discovery and upon motion against a party who fails to

15  make a showing sufficient to establish the existence of an element essential to that party's case,

16  and on which that party will bear the burden of proof at trial.  Celotex Corp. 477 U.S. at 322;

17  Miller, 454 F.3d at 987.  "[A] complete failure of proof concerning an essential element of the

18  nonmoving party's case necessarily renders all other facts immaterial."  Celotex Corp. 477 U.S. at

19  322.  In such a circumstance, summary judgment should be granted, "so long as whatever is

20  before the district court demonstrates that the standard for entry of summary judgment, as set

21  forth in Rule 56(c), is satisfied."  Id. at 323.

22         If the moving party meets its initial responsibility, the burden then shifts to the opposing

23  party to establish that a genuine issue as to a material fact actually does exist.  Matsushita Elec.

24  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986);  First Nat'l Bank of Arizona v. Cities

25  Serv. Co., 391 U.S. 253, 288-89 (1968);  Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies,

26  Inc.,210 F.3d 1099, 1103 (9th Cir. 2000).   The opposing party cannot "'rest upon the mere

27

28                                                    3

allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir.2008) (quoting Fed. R. Civ. Pro. 56(e)); Miller, 454 F.3d at 987. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson, 477 U.S. at 248; Cline v. Industrial Maintenance Engineering & Contracting Co., 200 F.3d 1223, 1229 (9th Cir. 2000), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. 248-49; In re Caneva, 550 F.3d 755, 761 (9th Cir. 2008); Lindsey v. SLT Los Angeles, LLC, 447 F.3d 1138, 1144 (9th Cir. 2006).   A "mere scintilla of evidence" supporting the non-moving party's position is insufficient to defeat a motion for summary judgment.  Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Rivera v. Philip Morris, Inc., 395 F.3d 1142, 1146 (9th Cir. 2005).  In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  First Nat'l Bank, 391 U.S. at 290;  Giles v. General Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007).  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c); Poller, 368 U.S. at 468; Price v. Sery, 513 F.3d 962, 965 n.1 (9th Cir 2008); Lockett v. Catalina Channel Exp., Inc., 496 F.3d 1061, 1064 (9th Cir. 2007).  "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson, 477 U.S. at 255); Miller, 454 F.3d at 987; Stegall v. Citadel

1  Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Finally, to demonstrate a genuine issue the

2  opposing party "must do more than simply show that there is some metaphysical doubt as to the

3  material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find

4  for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587

5  (citation omitted).

6          Additionally, the court has the discretion in appropriate circumstances to consider

7  materials that are not properly brought to its attention, but the court is not required to examine

8  the entire file for evidence establishing a genuine issue of material fact where the evidence is not

9  set forth in the opposing papers with adequate references.  See Southern Cal. Gas Co. v. City of

10  Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237

11  F.3d 1026, 1031 (9th Cir. 2001).

## UNDISPUTED FACTS[1]

13          Officer Noriega's use of her Glock handgun instead of the intended Taser to shoot Torres

14  on October 27, 2002, was accidental (hereinafter "the October 27, 2002 shooting").

15          Defendant Noriega was certified in the use of the Taser during a single class less than a

16  year prior to the October 27, 2002 shooting.

17          During her initial training, Defendant Noriega was handed a Taser and fired it.  See

18  Noriega Depo. II at 40-41.[2]  Defendant Noriega never pointed her Taser at someone and fired it

19  from a distance prior to the October 27, 2002 shooting.  Id.

20          During Defendant Noriega's formal training there was no discussion about which side the

21  Taser should be worn on.  See Noriega Depo. II at 18-20.  Defendant Noriega was given a right

---

[1]  Defendants' proposed undisputed facts and Plaintiffs' additional facts have been combined to create these Undisputed Facts.  These facts are considered undisputed for the purposes of this motion only.

[2]  Defendants claim the fact Defendant Noriega fired once is undisputed because Plaintiffs do not cite evidence to dispute this fact.  No such duty fell to Plaintiffs because Defendants never met their initial duty to provide evidence supporting the fact Defendant Noriega only fired "once" during training.  This sentence reflects Defendant Noriega's testimony.

side holster for the Taser, which is her dominant side.   Defendant Noriega testified that because she was given a dominant side holster, she would "say that's where they told us to put it."   See id. at 19.   Defendant Noriega was not given any choice as to where to wear her Taser (i.e. on the dominant side below her duty weapon) as the Department provided only one holstering option.

During Defendant Noriega's training, there was no discussion about a Sacramento incident in which an officer had mistaken a handgun for a Taser.   See Noriega Depo. II at 22. Prior to the October 27, 2002 shooting, Defendant Noriega had never heard anyone talk about an incident where another officer confused a duty weapon for a Teaser.   See id. at 23.

Prior to the October 27, 2002 shooting, Defendant Noriega had two incidents where there was confusion involving her Taser, her Glock, and their holsters.   They both occurred in late 2001, shortly after the initial Taser training.

In the first incident, or "the holster incident", Defendant Noriega mistakenly put her Glock into her Taser's holster after leaving the jail.   Defendant Noriega was concerned about this mistake and notified her Sergeant, who suggested that she practice putting the Taser in its proper holder.

A week later, Defendant Noriega experienced a second incident, or "the weapon incident".   See Noriega Depo. II at 27.   In this incident, Defendant Noriega pulled at her Taser and realized it was her Glock that she "was trying to get the tip off."   See id.   At the time, the Glock was pointed at another officer.   See id.   Defendant Noriega put the Glock back into its holster, pulled out her Taser, took the cartridge off, and touch-tased the man.   Defendant Noriega testified that during the weapon incident she had said "I hate the Taser being on that side."   See id. at 29.   When Defendant Noriega informed her Sergeant about what had happened, she told him she did not want to carry the Taser anymore.   See id. at 33.

Defendant Noriega was advised by Sergeant Lawson to practice continuously by drawing her Taser and then her Glock during the months between the weapon incident and the October 27, 2002 shooting, which she did.   Defendant Noriega received no additional training from the

Department.   See Noriega Depo. II at 40.  Defendant Noriega continued to practice drawing her Taser and Glock "all of the time" up until the October 27, 2002 shooting.  See Noriega Depo I at 175.   Defendant Noriega would draw her Taser and Glock before every shift and during down times on each shift.   Id.

Defendants' Expert, Charles Heal, testified that Officer Noriega's weapon confusion during the weapon incident would probably be considered an "anomaly" and not enough to go back and revamp the training program.  See Heal Depo. at 191-92.  Officer Noriega's training after the weapon incident was consistent with industry standards at the time because the incident was not enough to revamp the training program and a Sergeant followed up to make sure she was doing what he had instructed her to do, i.e. practicing drawing her Taser.  See id.

Prior to the October 27, 2002 shooting, Defendant Noriega used her Taser five or less times during actual police work.    In each of these times Defendant Noriega placed the Taser directly against the person she wanted to control and did a "touch tase".   She had never fired her Taser in the field.

Defendant Noriega felt everyone needed additional training in the use of the Taser.   See Noriega Depo. II at 35-37.

Defendant Noriega testified that the Taser would shift continuously on her thigh and the Taser would "push up" or "ride up" against the Glock's handle, shifting the Glock.  See Noriega Depo. I at 22-23 & 134-35.

Earlier during the evening of October 27, 2002, Defendant Noriega turned off the safety to her Taser while escorting another individual to a patrol car so that she could use the Taser more quickly in case the individual "went haywire".  See Noriega Depo. I at 98-102.  At the time, the individual was being confrontational.  Id. at 101.  Defendant Noriega had already observed Torres struggling with an officer.  See id. at 95-96, 99-100.

When Defendant Noriega chose to tase Torres, he was in the back of a patrol car kicking the window.  Defendant Noriega testified that she was not concerned for her safety.  Rather, she

7

decided to tase Torres because he was going to hurt himself.   <u>See</u> Noriega Depo. I at 124.

Defendant Noriega opened the car door while her Taser was still in the holster.   Defendant

Noriega never looked at the weapon she had pulled when she shot Torres.    Defendant Noriega

describes the October 27, 2002 shooting as follows:[3]

> Q.    After Ms. Meija's cuffs were being rearranged, what was the next thing that you recall occurring?
> A.    Mr. Torres going ballistic in the back seat, yelling and kicking at the window.
> Q.    Let's stop there.   What was Mr. Torres yelling?
> A.    "Get me out of this car."  I know he said the "F" word.  I don't know if he said "F" you or "F" this car.   "Get me out of this car."   He just kept yelling and kicking the window.
> Q.    Did he say anything about his cuffs being too tight?
> A.    No.
> . . . .
> Q.    And what was the next thing that you recall seeing or hearing?
> A.    Him kicking the window and the door.
> . . . .
> Q.    So he was in the back seat of the car; is that correct.
> A.    Correct.
> Q.    And you were directly behind the trunk; is that correct?
> A.    Correct.
> Q.    More oriented towards the passenger side or the driver's side?
> A.    I believe right in the middle.
> Q.    Okay.  And he was in the middle of the car?
> A.    He was laying down on his back kicking, so I guess his head was towards the middle, towards the other guy, and his feet were on – kicking the door.
> Q.    Kicking which door?
> A.    The driver's side passenger.   He was in the back seat, so it's the driver's side passenger rear door.
> Q.    And you then did what?
> A.    I told - - I don't remember who - - it was whoever was closest - - to stop him, to tase him because he was going to hurt himself.   I kept saying that and I guess I was the closest, so I started going towards the door.
> Q.    Towards which door?
> A.    The passenger - - the rear passenger driver's side door.
> Q.    Why didn't you go towards the door where the passenger - - excuse me - - the other person was in the rear seat?
> A.    Because he was in that seat.   It was closer to go to where he was to stop him from kicking - - from hurting himself and kicking that window.
> Q.    How do you know he was kicking the window?

---

[3]   All parties have cited to the portions of this testimony that they believe help their position.   For the court to fully understand this testimony about the October 27, 2002 shooting, all of Defendant Noriega's relevant testimony has been quoted. <u>See</u> <u>Southern Cal. Gas. Co.</u>, 336 F.3d at 889.

A.      You could see him kicking the window.

Q.      Could you have removed the other individual?

A.      I suppose you could have removed him, but it was closer to go to where he was to get him to stop kicking.

Q.      If you could have removed the other individual, you could have, for example, pepper sprayed Mr. Torres, correct?

. . . .

A.      It's a possibility.

Q.      And you knew Mr. Torres was kicking that door when you opened it; isn't that right?

A.      Correct.

Q.      What occurred?

A.      **I was yelling at him to stop or he was going to be tased.   I continued to tell him to stop or he was going to be tased.   And when I opened the door, he kicked and it pushed the door into me, and I stopped the door. At the same time that I stopped the door, I reached down for my taser.   And when I came up, I pulled the trigger, and I thought it was my taser, but it was my gun.**

Q.      You opened the door knowing that he was kicking it; isn't that right?

A.      That's why I was going to tase him with the prongs.

Q.      The question was:   You reached for the door while he was kicking it, correct?

A.      Correct.

. . . .

See Noriega Depo. I at 121-26 (emphasis added).

Defendant Noriega testified that, prior to the October 27, 2002 shooting, she was the only person on the Madera Police force that she knew about who had confused a Taser for a Glock.

Defendant Noriega's Taser and Glock handgun were virtually the same as those used by Officer Purnell in Henry v. Purnell, 501 F.3d 374 (4th Cir. 2007), with the exception that Defendant Noriega's Taser was solid black as opposed to the black and yellow striped model used by Officer Purnell.  Unlike Officer Purnell in the Henry case, Officer Noriega's Glock and Taser were both equipped with laser sites so as to further inhibit her ability to distinguish between the two.

Plaintiffs present the opinion of their expert, Lou Reiter, that the use of a Taser was not warranted under the circumstances facing Officer Noriega.   "[F]or summary judgment purposes, the fact that an expert disagrees with an officer's actions does not render the officer's actions unreasonable."  Billington v. Smith, 292 F.3d 1177, 1189 (9th Cir. 2002); Reynolds v. County of

1    San Diego, 84 F.3d 1162, 1170 (9th Cir. 1996).   Rather, the court must determine whether there

2    is a disputed issue of material fact concerning reasonableness based on the testimony presented to

3    the court.

4                                         **DISCUSSION**

5           A claim that a law enforcement officer used excessive force is to be analyzed under the

6    Fourth Amendment and its standard of objective reasonableness.   Graham v. Connor, 490 U.S.

7    386, 395 (1989); Tekle v. United States, 511 F.3d 839, 844 (9th Cir. 2007); Drummond v. City of

8    Anaheim, 343 F.3d 1052, 1056 (9th Cir. 2003).   The pertinent question in a Fourth Amendment

9    excessive force case is whether the use of force was "objectively reasonable in light of the facts

10   and circumstances confronting [the officers], without regard to their underlying intent or

11   motivation." Graham, 490 U.S. at 397; Blankenhorn v. City of Orange, 485 F.3d 463, 477 (9th

12   Cir. 2007).   The analysis of whether a specific use of force was reasonable "requires a careful

13   balancing of the nature and quality of the intrusion on the individual's Fourth Amendment

14   interests against the countervailing government interests at stake." Graham, 490 U.S. at 396;

15   Blankenhorn, 485 F.3d at 477; Teckle, 511 F.3d at 844; Davis v. City of Las Vegas, 478 F.3d

16   1048, 1054 (9th Cir. 2007).   There is a clearly established three part legal framework to analyze

17   an excessive force claim.   Teckle, 511 F.3d at 844.

18              . . . . The first factor in determining whether the force used was excessive
           is the severity of the force applied. *Drummond ex rel. Drummond v. City of*
19         *Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003). The second factor, and the most
           important, is the need for the force. *Miller v. Clark County*, 340 F.3d 959, 964
20         (9th Cir. 2003). The amount of force used is "'permissible only when a strong
           government interest compels the employment of such force.'" *Drummond*, 343
21         F.3d at 1057 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001)).
           Factors to be considered in determining the need for the force include "'the
22         severity of the crime at issue, whether the suspect poses an immediate threat to the
           safety of the officers or others, and whether he is actively resisting arrest or
23         attempting to evade arrest by flight.'" *Blanford*, 406 F.3d at 1115 (quoting
           *Graham*, 490 U.S. at 396, 109 S.Ct. 1865).
24              Finally, [the court] must balance the need for the force used against the need, to
           determine whether the force used was "greater than is reasonable under the
25         circumstances." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002).

26   Tekle, 511 F.3d at 844-45.

27

28                                         10

1   "In some cases . . . , the availability of alternative methods of capturing or subduing a

2   suspect may be a factor to consider." <u>Smith v. City of Hemet</u>, 394 F.3d 689, 701 & 703 (9th Cir.

3   2005).   However, reasonableness "must be judged from the perspective of a reasonable officer

4   on the scene, rather than with the 20/20 vision of hindsight." <u>Graham</u>, 490 U.S. at 396;

5   <u>Drummond</u>, 343 F.3d at 1058. "The calculus of reasonableness must embody allowance for the

6   fact that police officers are often forced to make split-second judgments – in circumstances that

7   are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a

8   particular situation." <u>Graham</u>, 490 U.S. at 396-97; <u>Drummond</u>, 343 F.3d at 1058. "Force is

9   excessive when it is greater than is reasonable under the circumstances." <u>Santos v. Gates</u>, 287

10  F.3d 846, 854 (9th Cir. 2002). When the circumstances show that there is no need for force, any

11  force used is constitutionally unreasonable. <u>Fontana v. Haskin</u>, 262 F.3d 871, 880 (9th Cir.

12  2001); <u>see also</u> <u>Motley v. Parks</u>, 432 F.3d 1072, 1089 (9th Cir. 2005).

13  **A.   Objectively Reasonable Mistake**

14        In this action, Plaintiffs contend that Defendant Noriega used unreasonable force when

15  she shot Torres with her Glock in violation of the Fourth Amendment.   Previously, this court

16  granted Defendants' motion for summary judgment on the ground that no seizure had occurred.

17  The Ninth Circuit reversed, holding that Torres was already seized under the continuing seizure

18  doctrine.  In remanding this action back to this court, the Ninth Circuit gave this court specific

19  instructions on the proper legal test to apply.    The Ninth Circuit found:

20        There is no question that Officer Noriega intended to draw her Taser but
      mistakenly drew her Glock. Faced with almost precisely the same situation-an
21    officer's mistake in drawing his Glock when he intended to draw his Taser-the
      Fourth Circuit concluded that the relevant inquiry was whether the officer's
22    mistake in using the Glock rather than the Taser was objectively unreasonable.
      *Henry*, 501 F.3d at 384.   We agree that this is the appropriate inquiry. The
23    Supreme Court has applied a reasonableness analysis to honest mistakes of fact in
      a variety of situations. *See, e.g., Maryland v. Garrison*, 480 U.S. 79, 87, 107 S.Ct.
24    1013, 94 L.Ed.2d 72 (1987) (mistaken but reasonable search of the wrong
      premises); *Hill v. California*, 401 U.S. 797, 803-04, 91 S.Ct. 1106, 28 L.Ed.2d
25    484 (1971) (mistaken but reasonable arrest of the wrong person). Although
      Everardo was already "seized" at the time of the shooting, it is Officer Noriega's
26    mistaken use of her Glock-not the preceding acts of placing Everardo under arrest
      and  handcuffing him-that the district court must examine for reasonableness. . . .

27

28                                              11

Torres I, 524 F.3d at 1056-57.   The Ninth Circuit advised that five factors are relevant to the reasonableness determination in this case: "(1) the nature of the training the officer had received to prevent incidents like this from happening; (2) whether the officer acted in accordance with that training; (3) whether following that training would have alerted the officer that he was holding a handgun; (4) whether the defendant's conduct heightened the officer's sense of danger; and (5) whether the defendant's conduct caused the officer to act with undue haste and inconsistently with that training."   Torres I, 524 F.3d at 1057 (citing Henry, 501 F.3d at 383). Besides these five factors, the Ninth Circuit stressed: "that 'the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments.'"   Torres I, 524 F.3d at 1057 (quoting Graham, 490 U.S. at 396-97).   The Ninth Circuit reminded the parties and the court that even if the court concludes Defendant Noriega acted unreasonably, she may "nevertheless be entitled to qualified immunity if the objective unreasonableness of her conduct in the course of Torres's seizure was not clearly established." Torres I, 524 F.3d at 1057 n.5.   The Ninth Circuit concluded:

> . . . . Since the parties did not brief the issue of whether Officer Noriega's mistake was a reasonable one, the factual record is insufficiently developed for this court to make this determination, and we remand to the district court to determine in the first instance whether Noriega's conduct was unreasonable under *Graham*, 490 U.S. at 396-97, 109 S.Ct. 1865, and to otherwise proceed with the matter.

Torres I, 524 F.3d at 1057.

    In resolving Torres I, the Ninth Circuit looked to the only similar case of weapon confusion by a Circuit Court of Appeals.   In Henry v. Purnell, 501 F.3d 374 (4th Cir. 2007), the defendant attempted to use his Taser to stop the plaintiff from fleeing arrest.   Id. at 376.   The defendant drew his firearm, rather than his Taser, and not realizing the mistake, the defendant shot and wounded the plaintiff.   Id.   The plaintiff sued, alleging a violation of the Fourth Amendment.   The Fourth Circuit recognized that it was faced with an atypical case because the claim was based on the fact that the defendant shot the plaintiff with a Glock, but this was not the level of force that the defendant intended to use.   Id. at 382. The Fourth Circuit found that a

1  mistaken understanding of the facts that is reasonable under the circumstances can make "a

2  seizure based on that understanding reasonable under the Fourth Amendment." Id. at 382.  The

3  Fourth Circuit remanded the case to the district court to determine whether the defendant's

4  mistake in using the Glock rather than the Taser was unreasonable, and if it was, whether the

5  defendant was entitled to qualified immunity. Id. at 384.   On remand, the District Court focused

6  on new discovery and the new discovery's impact on the five factors set forth above.   The

7  District Court found that the training the defendant had received on how to avoid mistakenly

8  drawing a firearm rather than a Taser was minimal.  Henry v. Purnell, 559 F.Supp.2d 648, 652

9  (D.Md. 2008).  Thus, the district court determined that this demonstrated the defendant's mistake

10 when he shot the plaintiff was an honest mistake.   Id.

11        In the pending motion for summary judgment, Defendants focus on the reasonableness of

12 Defendant Noriega's mistake.   Defendants contend that based on the undisputed facts,

13 Defendant Noriega's mistake was reasonable.   In the unlikely event that the court finds the

14 mistake unreasonable, Defendants contend that the court should find Defendant Noriega is

15 entitled to qualified immunity.   The court agrees that Defendant Noriega's mistake was

16 reasonable.

17        The factors outlined in Torres I that focus on Defendant Noriega's training tilt toward

18 finding that Defendant Noriega's mistake was reasonable.  In hindsight, the undisputed facts

19 reveal that Defendant Noriega's training in using a Taser was minimal.   During her training,

20 Defendant Noriega was handed a Taser and she shot it.   There is no evidence that Defendant

21 Noriega was ever instructed on how to avoid confusing her Glock with her Taser.   While

22 Defendant Noriega was given a dominant side holster and required to carry her Taser below her

23 Glock, there is no evidence that she had specific, formal training on how to distinguish between

24 the two weapons when drawing the weapons.   The undisputed evidence reveals that Defendant

25 Noriega was never told of a single incident in which another officer mistakenly pulled their

26 service gun rather than their Taser.   The only evidence before the court shows that Defendant

27

28                                                13

1   Noriega's one weapon mistake did not require further formal training, only additional practice.

2   The undisputed facts reveal that the only training Defendant Noriega received on how to avoid

3   confusing a Glock with a Taser was her own practice drawing the weapons.[4]

4          Because Defendant Noriega was not formally trained on how to avoid an incident like the

5   October 27, 2002 shooting, Defendant Noriega did not act inconsistently with her formal

6   training.   Similarly, because Defendant Noriega was not formally trained on how to avoid an

7   incident like this one, following her training would not have alerted Defendant Noriega to the

8   fact that she was holding a handgun.   Defendant Noriega did act inconsistently with what she

9   had practiced, but Defendant Noriega had never practiced under an unfolding situation like the

10  October 27, 2002 shooting, where there was little time to contemplate.   Thus, based on the

11  undisputed facts, little concerning Defendant Noriega's training demonstrates that the mistake

12  she made when she shot Torres was anything other than an honest one.

13         The other factors in determining whether Defendant Noriega's mistaken use of the Glock

14  was reasonable focus on Torres's conduct.   The evidence cited to by the parties reveal that

15  Torres's conduct heightened Defendant Noriega's sense of danger.   The undisputed evidence

16  reveals that Torres was in the back seat of the police car and kicking the window.   The court

17  agrees with Plaintiffs that at the time Defendant Noriega first decided to tase Torres, she was

18  concerned with the danger Torres's kicking posed to himself and not any danger to herself.

19  However, by the time Defendant Noriega fired the Glock, it appears Defendant Noriega's sense

20  of danger was broader.   Defendant Noriega testified that she originally intended to merely touch

21  tase Torres.   Defendant Noriega testified that she yelled at Torres to stop or he would be tased.

22

23         [4] While the court does not agree with Defendants that Defendant Noriega's holster
    incident is an "irrelevant red hearing", this incident offers little additional evidence to show that
24  Defendant Noriega should have had a heightened awareness of the possibility she would draw the
    wrong weapon.   In the holster incident, Defendant Noriega took her Glock out of a truck at the
25  jail and placed it in the wrong holster.   While this incident does show a general confusion by
    Defendant Noriega in having both weapons holstered on the dominate side, putting a weapon in
26  the wrong holster is far different than drawing the wrong weapon in the heat of an evolving
    police confrontation.   Thus, this incident has not been given much weight other than to show
27  Defendant Noriega had both practiced drawing and holstering her weapons.

28                                           14

Defendant Noriega testified that when she opened the door, Torres kicked the door into her and Defendant Noriega stopped the door.    Defendant Noriega testified that at the same time that she stopped the door, she reached down for her Taser, came up, and pulled the trigger.   See Noriega Depo. I at 125.   Given the fact Defendant Noriega pulled what she thought was the trigger of her Taser while Torres was pushing an open door into her, Defendant Noriega acted while the situation was evolving.   However, contrary to Defendants' attorney's contentions, Defendant Noriega neither testified that she felt a sense of personal danger when the door was pushed into her nor has she signed a declaration making such an assertion.   As such, the court finds that to the extent Torres's own conduct created a heightened sense of danger, that sense of danger was focused on Torres's danger to himself, not any personal danger Defendant Noriega felt for her own safety or the safety of others.   As such, this factor is not a particularly strong factor.

The last factor focuses on whether Torres's conduct caused Defendant Noriega to act with undue haste and inconsistently with her training.   Torres's conduct in kicking the door into Defendant Noriega appears to have caused Defendant Noriega to go from warning Torres about a touch tase and intending to touch tase him to quickly firing her Glock, thinking it was a Taser. Given the fact the door was now open and had been pushed into Defendant Noriega, whatever moments Defendant Noriega had previously had to consider how to best stop Torres from hurting himself by kicking the door evaporated.   As such, Torres's own conduct did contribute to the haste with which Defendant Noriega had to act.   However, the lack of evidence from Defendant Noriega that she actually felt danger and that she had to act hastily limits the strength of this factor.   Thus, while this factor tilts toward finding a reasonable mistake, it is not as strong as it would be if there was evidence Torres was struggling with Defendant Noriega or in flight.

All factors at least tilt toward finding that Defendant Noriega's mistake was reasonable. Defendants have provided evidence that Defendant Noriega had no knowledge of other incidents where officers confused their weapons, and Plaintiffs have failed to refute this fact with evidence showing this knowledge.   There is simply no evidence cited to the court that Defendant Noriega

was formally trained to avoid weapon confusion.  Contrary to Defendants' assertion, Defendant

Noriga had more training than the officer in <u>Henry</u> because Defendant Noriega had previously

confused her weapons and practiced drawing her Taser.   However, given the lack of formal

training on this potential mistake if both weapons were worn on the dominant side, the court

cannot find Defendant Noriega's actions unreasonable.  While evidence of a sense of danger and

haste within which she had to act are not overly strong factors in light of the lack of evidence

Defendant Noriega personally felt danger for her own safety, these factors are present.  At the

moment the door was pushed into her, Defendant Noriega was forced to make a split-second

judgment in a tense, uncertain, and rapidly evolving situation about firing a weapon.  <u>See</u>

<u>Graham</u>, 490 U.S. at 397; <u>Torres I</u>, 524 F.3d at 1057.  Thus, the court finds that the undisputed

facts reveal that there was no Fourth Amendment violation because Defendant Noriega's mistake

was reasonable.

**B.  Qualified Immunity**

Even assuming Defendant Noriega's mistake was unreasonable, and as such, violated the

Fourth Amendment, summary adjudication on Plaintiffs' Fourth Amendment claim is still

warranted.   Defendant Noriega is entitled to qualified immunity because the law concerning

when weapon confusion would violate the Fourth Amendment was not clearly established at the

time of the October 27, 2002 shooting.

"The doctrine of qualified immunity protects government officials from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." <u>Pearson v. Callahan</u>, – U.S.– , 129 S.Ct.

808, 815 (2009); <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982); <u>Rodis v. City, County of San</u>

<u>Francisco</u>, 558 F.3d 964, 968 (9th Cir. 2009); <u>Jeffers v. Gomez</u>, 267 F.3d 895, 910 (9th Cir. 2001).

"Qualified immunity balances two important interests – the need to hold public officials

accountable when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson</u>, 129

16

S.Ct. at 815; <u>Rodis</u>, 558 F.3d at 968.  "The entitlement is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985); <u>Rodis</u>, 558 F.3d at 968.   The defendant bears the burden of establishing qualified immunity.  <u>Crawford-El v. Britton</u>, 523 U.S. 574, 586-87 (1998).

Where a constitutional violation occurs, a police officer is entitled to qualified immunity if she acted reasonably under the circumstances.  <u>Millender v. County of Los Angeles</u>, 564 F.3d 1143, 1148 (9th Cir. 2009).   The Supreme Court in <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), outlined a two-step approach to qualified immunity.   The first step requires the court to ask whether taking the facts "in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  <u>Saucier</u>, 533 U.S. at 201; <u>Millender</u>, 564 F.3d at 1148. "If the answer to the first inquiry is yes, the second inquiry is whether the right was clearly established: in other words, 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  <u>Millender</u>, 564 F.3d at 1148 (quoting <u>Saucier</u>, 533 U.S. at 201).   In <u>Pearson v. Callahan</u>, – U.S. – , 129 S.Ct. 808 (2009), the Supreme Court held that "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  <u>Id</u>. at 818.

The operation of the "clearly established federal law" inquiry depends substantially upon the level of generality at which the relevant "legal rule" is to be identified.  <u>Anderson v. Creighton</u>, 483 U.S. 635, 639 (1987); <u>Rodis</u>, 558 F.3d at 969.  "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  <u>Anderson</u>, 483 U.S. at 640; <u>Rodis</u>, 558 F.3d at 969.  "The injured party need not establish that the Defendants' behavior had been

previously declared unconstitutional." Rodis, 545 F.3d at 969.   Police officers "can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002).   Even if there is no Supreme Court or circuit case that presents facts that are "fundamentally similar" or "materially similar" to those presented, the relevant question is still whether, at the time the state of the law gave the defendant fair warning that the force used was unconstitutional.  Blankenhorn v. City of Orange, 485 F.3d 463, 481 (9th Cir. 2007).   The inquiry is whether it would be clear to a reasonable officer that his or her conduct was unlawful in the situation he or she confronted.  Saucier, 533 U.S. at 202; Rodis, 545 F.3d at 969.   In determining whether the right was clearly established, and whether a reasonable person would  have known his or her actions violated this right, the court may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent.  Prison Legal News v. Lehman, 397 F.3d 692, 701-02 (9th Cir. 2005); Sorrels v. McKee, 290 F.3d 965, 970 (9th Cir. 2002).

At the time of the October 27, 2002 shooting there was no clearly established federal law on what would make an officer's mistaken use of her gun instead of her Taser unreasonable.   As of October 27, 2002, the Supreme Court had addressed when reasonable mistaken searches and mistaken arrests would not be a Fourth Amendment violation.  In Maryland v. Garrison, 480 U.S. 79 (1987), the Supreme Court found that an officer's reasonable failure to appreciate that a valid warrant was overbroad when conducting a search created no Fourth Amendment violation.  Id. at 88.   In Garrison, police officers executed a warrant to search Lawrence McWebb and  "the premises known as 2036 Park Avenue third floor apartment."  Id. at 80.   When the police officers applied for the warrant and conducted the search, they reasonably believed that there was only one apartment on the premises described in the warrant.  Id. at 80-81.  In fact, the third floor was divided into two apartments, one belong to McWebb and one belonging to Garrison.  Id. Before the officers executing the warrant became aware that they were in a separate apartment belonging to Garrison, the officers found contraband, which was then used to convict Garrison.

Id.  The Supreme Court found no Fourth Amendment violation.  Id. at 85 & 88-89.   The
Supreme Court determined that the issue was whether the officers' failure to realize the warrant's
overbreadth was understandable and reasonable.  Id. at 87-88.   The court found the officers'
mistake was understandable and reasonable because the objective facts available to the officers at
the time suggested no distinction between McWebb's apartment and the third-floor premises.  Id.
at 88.  In making this decision, the Supreme Court recognized "the need to allow some latitude
for honest mistakes that are made by officers in the dangerous and difficult process of making
arrests and executing search warrants."  Id. at 87.

In Hill v. California, 401 U.S. 797 (1971), the Supreme Court considered the validity of
the arrest of a man named Miller based on the mistaken belief that he was another man named
Hill.   The officers had probable cause to arrest Hill.   Id. at 803.  Upon gaining entry into Hill's
apartment, the officers were confronted with someone who fit Hill's description.  Id.  While
Miller told the officers he was not Hill, he also made other statements that the officers knew were
untrue and/or unconvincing.  Id.  The Supreme Court determined that the officers in good faith
believed Miller was Hill and arrested him.  Id. at 803-04.   While the officers turned out to be
wrong, the Supreme Court found no Fourth Amendment violation.  Id.  The Supreme Court
reasoned that "sufficient probability, not certainty, is the touchstone of reasonableness under the
Fourth Amendment and on the record before us the officers' mistake was understandable and the
arrest a reasonable response to the situation facing them at the time."  Id. at 804.

From Garrison, Hill, and their progeny the law was clearly established in 2002 that
reasonable factual mistakes when conducting searches and making arrests do not violate the
Fourth Amendment, and as such, a reasonable officer would know that unreasonable mistakes do
violate the Fourth Amendment.   However, this case does not involve a mistaken search or arrest.
Garrison and Hill provide little guidance on when a mistaken use of force violates the Fourth
Amendment.   Thus, it would have been unclear to a reasonable officer in 2002 when a mistaken
use of force violated the Fourth Amendment.

1    As of 2002, some courts had rejected the idea that a mistaken use of force could ever

2 violate the Fourth Amendment.   In Dodd v. City of Norwich, 827 F.2d 1 (2nd Cir. 1987), the

3 Second Circuit was faced with a mistaken shooting.   Dodd and another individual committed a

4 burglary at a house with a silent alarm, and two officers responded.   The defendant officer

5 apprehended Dodd after he fell through a window at the rear of the house.   Id. at 3.   The

6 defendant officer decided to handcuff Dodd and told Dodd, who was lying on the ground, to

7 place both hands in front of his head and lie with his face on the ground.   Dodd did not comply.

8 Id.   The defendant officer then knelt by Dodd's head and placed a cuff on Dodd's left wrist,

9 while still holding his gun in the other hand.   While the defendant officer reached for Dodd's

10 right hand, Dodd jerked forward and reached for the officer's gun.   Id.   The officer reacted by

11 pulling his hand and the gun away; the gun discharged, killing Dodd.   Id.   The Second Circuit

12 found no Fourth Amendment violation because the shooting was accidental.   Id. at 7.   The

13 Second Circuit reasoned that "[i]t makes little sense to apply a standard of reasonableness to an

14 accident.   If such a standard were applied, it could result in a [F]ourth [A]mendment violation

15 based on simple negligence."   Id.

16    The court notes that the Second Circuit never clearly stated whether Dodd had been

17 seized at the time of the shooting, as the Ninth Circuit has stated Torres was seized in this action.

18 However, Dodd had clearly already been apprehended at the time of the shooting.   Dodd, 827

19 F.2d at 7.   The Second Circuit found that the defendant officer did not shoot Dodd for the

20 purpose of seizing him, and for all intents and purposes, Dodd had already been seized.   Id.

21 Under the Ninth Circuit's continuing seizure rule, Dodd had already been seized at the time of

22 the shooting.   See, e.g., Robins v. Harum, 773 F.2d 1004, 1009 (9th Cir. 1985) (holding seizure

23 occurs whenever officer restrains individual's freedom to walk away, and once a seizure has

24 occurred, it continues throughout time individual is in officer's custody).

25    In Owl v. Robertson, 79 F.Supp.2d 1104 (D.Neb 2000), the defendant, Robertson, was in

26 uniform and armed.   He encountered a number of people that smelled like they had been

27

drinking.  Id. at 1109.  Robertson also saw Owl, who was walking or running away.  Id.  Other than walking or running away, Owl never resisted arrest, threatened Robertson, or attacked him.  According to Robertson, Owl was "just walking around in a drunken stupor."  With his gun in his hand, Robertson took Owl to the ground, at which time Owl suffered no injury other than a skinned knee and the loss of his glasses.  At that point, Robertson was either standing or kneeling by or over Owl.  A second or two later, Robertson's gun discharged.  The bullet struck Owl in the neck and exited under his chin.  Id. at 1109-10.  The District Court found that the inadvertent discharge of the weapon could not be characterized as excessive even if Owl had already been "seized" by Robertson when the gun was fired.  Id. at 1114.  The District Court found no violation because the Fourth Amendment protects citizens against willful shootings and not accidental, but otherwise reasonable, ones.  Id.

In Troublefield v. City of Harrisburg, Bureau of Police, 789 F.Supp. 160 (M.D.Pa. 1992), the defendant officer had been dispatched in response to a call about a possible car theft.  Id. at 161-62.  Finding the plaintiff in the front seat of a car, the defendant drew his weapon and asked the plaintiff if he owned the car.  The plaintiff, "who was intoxicated, answered 'No. I guess you got me.'"  Id. at 162.  The defendant ordered the plaintiff to climb out of the car and lie on the ground, and the plaintiff complied, extending himself prostrate, facing the ground.  Id.  With his pistol still drawn, the defendant began searching the plaintiff and then proceeded to apply handcuffs.  Id.  As he locked the handcuffs, the defendant started to return his weapon to his holster.  Suddenly, the weapon fired, propelling a bullet into the plaintiff's leg.  Id.  The District Court found that at the time of the shooting the defendant had effectively already taken the plaintiff into his control through a means intentionally applied.  Id. 166.  The District Court concluded that because the defendant fired the bullet by accident no Fourth Amendment rights were "trampled upon."  Id.

Based upon Dodd, Owl, and Troublefield a reasonable officer could have believed in 2002 that an unintentional, accidental shooting of a seized individual did not violate the Fourth

1  Amendment.    In each of the above cases the victim had been seized prior to the shooting

2  because the officer had restrained the victim's freedom to leave, but the courts still found no

3  Fourth Amendment violation.  From these cases, a reasonable officer could conclude that

4  mistaken uses of force on seized individuals do not violate the Fourth Amendment.  Pursuant to

5  these cases, a reasonable officer could have concluded that even unreasonable mistakes do not

6  violate the Fourth Amendment because looking that the reasonableness of a mistake is more akin

7  to negligence law than a constitutional violation.  See Dodd 827 F.2d at 7-8.

8      Even if the law was clear that an unreasonable mistaken use of force violated the Fourth

9  Amendment in 2002, the law remained unclear on how to determine if a mistaken use of force

10  was reasonable or unreasonable.   The factors set forth in Henry and Torres I to determine if a

11  mistaken use of a weapon is reasonable were not in place in 2002.   Thus, a reasonable officer in

12  2002 would not have known when the line crossed between a reasonable mistaken use of the

13  wrong weapon and an unreasonable mistaken use of the wrong weapon.

14      The concern of the qualified immunity inquiry is to acknowledge that reasonable mistakes

15  can be made when determining a police officer's legal constraints.  Saucier, 533 U.S. at 205.

16  The Supreme Court has stressed that qualified immunity "provides ample protection to all but the

17  plainly incompetent or those who knowingly violate the law."  Hunter v. Bryant, 502 U.S. 224,

18  229 (1991) (per curiam); Malley v. Briggs, 475 U.S. 335, 343 (1986); Rodis, 558 F.3d at 971.

19  Here, the court cannot find that Defendant Noriega's mistaken use of the Glock was incompetent

20  or a knowing violation of the law.   Thus, Defendant Noriega is entitled to qualified immunity.

21  **C. Decision to Tase**

22      In their opposition, Plaintiffs take the position that the court should not focus on the

23  reasonableness of Defendant Noriega's mistake when shooting her Glock rather than her Taser.

24  Rather, Plaintiffs contend that Defendant Noriega's decision to use the Taser must also be

25  analyzed to determine if Defendant Noriega violated Torres' Fourth Amendment rights.

26  Plaintiffs argue that Defendant Noriega's use of a Taser to stop Torres from kicking the doors

27

28                                     22

was an unreasonable use of force in violation of the Fourth Amendment.  As evidence for this position, Plaintiffs' cite to their export's opinion that the use of a Taser to stop a suspect from kicking doors in the back of a police car constitutes excessive force.

### *1.  New Theory*

Preliminarily, the court notes that, up until Plaintiffs' opposition, this case has focused on Defendant Noriega's mistaken use of her Glock and not the lawfulness of using a Taser.  The court has reviewed the operative complaint.  The complaint alleges that "the shooting was an unreasonable use of force in violation of the Fourth Amendment."   The complaint does not allege that the use of a Taser under the circumstances would also have been unreasonable.  Neither during the prior motion for summary judgment nor during the appeal did Plaintiffs allege or pursue this theory.   The court has proceeded in this action under the assumption that Plaintiffs' Fourth Amendment claim was based on the mistaken use of the Glock, not the decision to use a Taser.  This theory is raised for the first time in the opposition to the pending motion for summary adjudication.

A plaintiff cannot raise a new theory of liability in the plaintiff's opposition to a motion for summary judgment or summary adjudication.  Harris Technical Sales, Inc. v. Eagle Test Systems, Inc., 2008 WL 343260, *17 (D.Ariz. 2008);  Tenet Healthsystem Desert, Inc. v. Fortis Ins. Co., Inc., 520 F.Supp.2d 1184, 1193 n. 9 (C.D. Cal. 2007); Gorman v. Wolpoff & Abramson, LLP, 435 F.Supp.2d 1004, 1011 (N.D. Cal. 2006), *reversed in part on other grounds by* Gorman v. Wolpoff & Abramson, LLP, 552 F.3d 1008 (9th Cir. 2009); Matthews v. Xerox Corp., 319 F.Supp.2d 1166, 1172 (S.D. Cal. 2004).  If the complaint focuses on one theory of liability, the plaintiff cannot turn around and surprise the defendant at the summary judgment stage with a new theory of liability.  See Coleman v. Quaker Oats Co., 232 F.3d 1271, 1292-93 (9th Cir. 2000) (finding in employment discrimination case that plaintiff's failure to plead disparate impact theory in complaint or to make it known during discovery precluded raising theory in opposition to motion for summary judgment).  This legal principle is necessary because

23

the purpose of the complaint is to guide the parties' discovery, and to put "the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations." Coleman, 232 F.3d at 1292.   Thus, Plaintiffs' attempt to re-focus the Fourth Amendment claim on Defendant Noriega's reasonableness when she decided to tase Torres is not appropriate at this late date.   Regardless, Defendant Noriega is entitled to qualified immunity on this issue.

### *2. Expert*

         Plaintiffs' evidence that Defendant Noriega's use of even a Taser under the circumstances was unreasonable is based on the opinion of their expert, Lou Reiter.   Defendants appear to object to Mr. Reiter's qualifications as an expert.   In Defendants' reply to Plaintiffs' separate statement and additional facts, Defendants state that "[a]s more fully set forth in Defendants' Reply, Lou Reiter is . . . unqualified to render" an opinion that the use of a Taser was unwarranted.   In Defendants' reply brief, Defendants object to Mr. Reiter's lack of certification in Taser use "[a]s more fully set forth in Defendants' objections to Reiter's opinions."   It is entirely unclear what objections to Mr. Reiter's opinions Defendants are referring to.   No objections were filed along with Defendants' reply brief, and no objections were filed as part of Defendants' motion.   Thus, it is unclear what objection Defendants have to Mr. Reiter.

         While not briefed by Defendants, Federal Rule of Evidence 702 governs the admissibility of expert testimony.   Pursuant to Rule 702, a witness qualified as an expert in "scientific . . . knowledge" may testify thereto if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."   Fed.R.Evid. 702.   The trial court acts as a gatekeeper to the admission of expert testimony under Rule 702.   Pursuant to Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), the court must conduct a preliminary assessment to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."   Id. at 589.

         Mr. Reiter's preliminary expert report is provided by Plaintiffs.   Mr. Reiter's report

1  shows he has significant training on the use of force by police, and he has testified in numerous

2  state and Federal courts concerning the use of force.   While Mr. Reiter is clearly a qualified

3  expert on the general topic of the use of force by police, Mr. Reiter has neither been certified in

4  Taser use nor has he personally used a Taser as a police officer.   Thus, the court questions

5  whether Mr. Reiter is truly qualified to offer expert opinions on when a Taser is an appropriate

6  use of force or to offer opinions on where the use of a Taser falls on the force scale.   Regardless,

7  even if the court consider's Mr. Reiter's opinions, Defendant Noriega is entitled to qualified

8  immunity.

9  ***3.   Law Requiring Court of Focus on Decision to Tase***

10        In their opposition, Plaintiffs cite <u>McCoy v. City of Monticello</u>, 342 F.3d 942 (9th Cir.

11  2003), for the proposition that this court's emphasis should be on the reasonableness of

12  Defendant Noriega's decision to draw a Taser and not on the reasonableness of Defendant

13  Noriega's mistake.   In <u>McCoy</u>, the officer activated his police cruiser's lights and siren because

14  the plaintiff's truck was sliding on the highway.   <u>Id</u>. at 845.   When the plaintiff did not pull over,

15  the officer pulled in front of the plaintiff's truck, the truck swerved to miss the police cruiser, and

16  the truck landed in a ditch.   <u>Id</u>.   The plaintiff got out of the truck with his hands clasped, as if

17  holding a gun.   <u>Id</u>.   The officer ran towards the plaintiff with his gun drawn.  When he was

18  within a few feet of the plaintiff, the officer slipped, the gun discharged, and a bullet struck the

19  plaintiff in the chest.   <u>Id</u>.   The Eighth Circuit found that the relevant inquiry was not whether the

20  officer's accidental discharge of his gun was "objectively reasonable"; the issue was "whether

21  under the totality of the circumstances, his act of drawing his gun was objectively reasonable."

22  <u>Id</u>. at 848.

23        The Eighth Circuit in <u>McCoy</u> set forth a different analysis of what conduct the court

24  should review for reasonableness than that set forth by the Ninth Circuit in <u>Torres I</u>.   "A district

25  court in California must follow Ninth Circuit precedent, which has not been overruled."  <u>Harris</u>

26  <u>v. City of Fresno</u>, – F.Supp.2d – , 2009 WL 1460822, *23 (E.D.Cal. 2009); <u>Graves v. Arpaio</u>,

27

28                                                     25

1   2009 WL 1047847, *6 (D.Ariz. 2009); Gentry v. Sinclair, 609 F.Supp.2d 1179, 1194

2   (W.D.Wash. 2009); Carlin v. Wong, 552 F.Supp.2d 1023, 1036 (N.D.Cal. 2008).   "[W]hen the

3   Ninth Circuit or any of its coequal circuit courts issue an opinion, the pronouncements become

4   the law of that geographical area." United States v. AMC Entertainment, Inc., 549 F.3d 760, 771

5   (9th Cir. 2008); see also  Zuniga v. United Can Co., 812 F.2d 443, 450 (9th Cir. 1987) (noting that

6   district courts are "bound by the law of their own circuit," and "are not to resolve splits between

7   circuits . . . .")   Thus, this court must look to the reasonableness of Defendant Noriega's mistake

8   pursuant to Torres I, not the reasonableness of using the Taser pursuant to McCoy and related

9   cases.

10   *4.  Qualified Immunity*

11          Even if part of the analysis requires the court to look to the reasonableness of drawing a

12   Taser, Defendant Noriega is entitled to qualified immunity.   As discussed above, the qualified

13   immunity inquiry requires the court to determine if it would have been "clear to a reasonable

14   officer that [her] conduct was unlawful in the situation [she] confronted."   Saucier, 533 U.S. at

15   201; Millender, 564 F.3d at 1148.   "The contours of the right must have been clear enough that a

16   reasonable officer would have understood that what he or she was doing violated that right."

17   Moreno v. Baca, 431 F.3d 633, 638 (9th Cir. 2005) (citing Anderson, 483 U.S. at 640).   Police

18   officers "can still be on notice that their conduct violates established law even in novel factual

19   circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002).   Even if there is no Supreme Court

20   or Circuit Court of Appeals case that presents facts that are "fundamentally similar" or

21   "materially similar" to those presented, the relevant question is still whether, at the time the state

22   of the law gave the defendant fair warning that the force used was unconstitutional.   Blankenhorn

23   v. City of Orange, 485 F.3d 463, 481 (9th Cir. 2007).

24          Plaintiffs contend that the law concerning excessive force was clearly established at the

25   time of the October 27, 2002 shooting.   By 2002, the law was clearly established that the Fourth

26   Amendment is violated if a police officer's use of force officer was objectively unreasonable in

27

28                                                      26

light of the facts and circumstances.  See Graham, 490 U.S. at 397; Blankenhorn, 485 F.3d at

477.   However, in Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court found that this

principle is often too general for the qualified immunity analysis.  Id. at 201-02.   Citing the

objectively unreasonable test set forth in Graham, the Supreme Court has found that Graham

"does not always give a clear answer as to whether a particular application of force will be

deemed excessive by the courts."  Saucier,  533 U.S. at 205-06.   Thus, the mere fact that Graham

and its progeny set forth the standard for Fourth Amendment excessive force claims prior to 2002

does not automatically mean the law was clearly established concerning Defendant Noriega's use

of force in this case.

Plaintiffs cite authority for the proposition that using any force on a subject that has

already been subdued is unconstitutional.  "The use of a force against a person who is helpless or

has been subdued is constitutionally prohibited."  Motley v. Parks,  432 F.3d 1072, 1088 (9th Cir.

2005); see also Headwaters Forest Def. v. County of Humboldt, 276 F.3d 1125, 1130 (9th Cir.

2002) (holding that repeated use of pepper spray against nonviolent protestors under police

control rose to the level of excessive force).   As such, by October 27, 2002, a reasonable officer

would have known that using force against an arrested person who had been subdued was

unconstitutional.   However, this is not the case of Defendant Noriega intending to tase a man

handcuffed who was complacently and tranquilly sitting in the back of a police car.   Torres was

kicking the window of the car.   Plaintiffs' own expert agrees that the use of some type of force

to stop this behavior was warranted.    Plaintiffs' expert claims Torres should have either been

further restrained by using leg restraints or seat belted in the car.   See Reiter Expert Report at 16-

17.   Both of these options would have required some force to accomplish, including the removal

of the other individual handcuffed in the backseat.    Thus, the cases relied on by Plaintiffs for the

proposition that force should not be used on subdued and restrained individuals do not apply to

this case.

To avoid the fact that Torres was kicking the windows and a danger to himself, Plaintiffs

1  contend Defendant Noriega should have asked Torres to stop ticking.   Plaintiffs cite no cases

2  that have held no level of force can be used until verbal commands have been given.   Thus,

3  Plaintiffs have failed to establish that not giving verbal commands violated the Fourth

4  Amendment.   Regardless, the only evidence cited to the court by the parties is Defendant

5  Noriega's deposition testimony that she did tell Torres he would be tased if he did not stop

6  kicking.  See Depo I. at 25-26.[5]

7          Plaintiffs contend that, as a matter of law, the use of a Taser on Torres violated the Fourth

8  Amendment.   This court has already issued a lengthy opinion concerning the use of Tasers and

9  the fact that the standard for when a Taser is an appropriate use of force was not established in

10  2004.   In Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1168 (E.D. Cal. 2008), this court

11  made the followings findings concerning the use of Tasers:

12      [C]ase law indicates that Tasers are generally considered non-lethal or less lethal
        force.  See Ewolski v. City of Brunswick, 287 F.3d 492, 508 (6th Cir.2002);
13      Matta-Ballesteros v. Henman, 896 F.2d 255, 256 n. 2 (7th Cir.1990); Montgomery
        v. Morgan County, 2008 WL 596068, *11, 2008 U.S. Dist. LEXIS 15846, *32
14      (S.D.Ind.2008); Fuller v. Cuyahoga Metro. Hous. Auth., 2008 WL 339464, *18 n.
        25, 2008 U.S. Dist. LEXIS 8730, *57 n. 25 (N.D.Ohio 2008); McDonald v. Pon,
15      2007 WL 4420936, *2-3, 2007 U.S. Dist. LEXIS 92356, *6-7 (W.D.Wash.2007);
        see also San Jose Charter of the Hells Angels Motorcycle Club v. City of San
16      Jose, 402 F.3d 962, 969 n. 8 (9th Cir.2005); cf. Draper v. Reynolds, 369 F.3d
        1270, 1278 (11th Cir.2004). Tasers have been described as "a non-lethal device
17      commonly used to subdue individuals resisting arrest. It sends an electric pulse
        through the body of the victim causing immobilization, disorientation, loss of
18      balance, and weakness. It leaves few, if any, marks on the body of the victim."
        Matta-Ballesteros, 896 F.2d at 256 n. 2. Similarly, another court has explained
19

20

       ————————————————

21      [5] The court recognizes that there may be other depositions that discuss a lack of
        warnings.  However, these have not been cited to the court, and it is not the court's burden to
22      search numerous transcripts previously provided to the court on the prior motion for summary
        judgment to determine if there is a disputed issue of fact on whether Defendant Noriega gave
        warnings.
23          Mr. Reiter's expert report refers to other deposition testimony not cited to by the parties as
        part of the pending motion.  Based on these other depositions, Mr. Reiter states in his export
24      report that Defendant Noriega did not warn Torres she would tase him.  The court finds this
        evidence insufficient to create a disputed issue of fact on whether Defendant Noriega warned
25      Torres.  First, Plaintiffs do not cite to Mr. Reiter's expert report, or the other depositions, to
        provide evidence Defendant Noriega did not warn Torres.  In addition, Mr. Reiter's report's
26      recitation of other depositions' contents is inadmissible hearsay.  See  Fed.R.Civ.P. 56(e)
        (requiring personal knowledge); Fed.R.Evid. 703 (facts set forth in expert report that are
27      otherwise inadmissible shall not be disclosed).

28                                              28

that a Taser "works by causing involuntary muscle contractions, similar to muscle cramps, that preclude the suspect from engaging in the type of coordinated motion necessary to fight or flee." McDonald, 2007 WL 4420936 at *3, 2007 U.S. Dist. LEXIS 92356 at *7. Further, one court has noted that pain is a necessary byproduct of the Taser, pain is not the primary motivator, the Taser is considered to inflict considerably less pain than other forms of force, and the effects of the Taser are generally temporary. See Beaver v. City of Federal Way, 507 F.Supp.2d 1137, 1142-43 (W.D.Wash.2007).

Sanders, 551 F.Supp.2d at 1168.   As more fully explained in Sanders, this court does not believe that the law was clearly established as it relates to Taser use and excessive force in 2004, let alone in 2002.   See id. at 1172.   Plaintiffs do not cite any cases in which courts have concluded that using a Taser or the threat of using a Taser constitutes excessive force.   This suggests Plaintiff's right to be free from Taser use when posing a danger to himself was not clearly established in 2002.    In addition, even Plaintiffs' experts proposed options in this situation would also have required some force.   Thus, the court finds that Defendant Noriega's decision to use a Taser was not a violation of any clearly established federal law.   Accordingly, to the extent Defendant Noriega's decision to use a Taser matters to the Fourth Amendment claim, Defendant Noriega is entitled to qualified immunity.

## CONCLUSION AND ORDER

The court finds that, at a minimum, Defendant Noriega is entitled to qualified immunity for her mistaken shooting of Torres, and as such Defendants are entitled to summary adjudication on Plaintiffs' Fourth Amendment claim.   In making this finding, the court is *not* finding as a matter of law that Defendant Noriega did nothing wrong and/or that Torres caused his own death. This court has sympathy for Plaintiffs and their loss.   However, in some circumstances 42 U.S.C. § 1983 simply does not provide relief.   Not every injury done to a citizen by the government rises to the level of a constitutional violation.   Plaintiffs remedy for Defendant Noriega's tragic mistake lies in tort, not the Constitution.

Based on the above memorandum opinion, the court ORDERS that:

    1.    Defendants' motion for summary adjudication is GRANTED;

2.     Defendants are GRANTED qualified immunity on Plaintiffs' Fourth Amendment claim, and as such, Defendants are GRANTED summary adjudication on Plaintiffs' Fourth Amendment claim;

3.     Within fifteen days the parties are ORDERED to file a status report on what issues they believe remain for trial and how this action should proceed forward.

IT IS SO ORDERED.

**Dated:     July 7, 2009**                              **/s/ Anthony W. Ishii**
                                                              CHIEF UNITED STATES DISTRICT JUDGE

30